DA 15-0038

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 244

IN THE MATTER OF:

T.D.H., J.H., and J.H.,

  Youths in Need of Care.

APPEAL FROM:  District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause Nos. DN 12-022(A), 12-021(A), 12-022(A)
Honorable Ted O. Lympus, Presiding Judge

COUNSEL OF RECORD:

  For Appellants:

  Robin Meguire, Attorney at Law, Great Falls, Montana (for T.D.H.)

  Tracy Labin Rhodes, Attorney at Law, Missoula, Montana (for Mother)

  Kathryn McEnery, McEnery Law Office, PLLC, Hot Springs, Montana (for J.H.)

  For Appellee:

  Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant Attorney General, Helena, Montana

  Emily VonJentzen, Assistant Attorney General, Child Protection Unit, Kalispell, Montana

  Edward J. Corrigan, Flathead County Attorney, Kalispell, Montana

Submitted on Briefs:  June 24, 2015
Decided:  August 18, 2015

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 This appeal is taken from three separate orders entered by the Eleventh Judicial District Court, Flathead County, during proceedings resulting in the termination of the parental rights of Ta.H. (Mother) to her three minor children, T.D.H., Je.H., and Ja.H.[1] Purportedly on behalf of Ja.H., the Office of the State Public Defender (OPD) appeals the District Court's orders rescinding OPD's appointment of counsel for Ja.H. and denying OPD's motion to appoint counsel for Ja.H. Mother and T.D.H. appeal the District Court's order terminating Mother's parental rights. We restate and address the following issues on appeal:

1. *Whether the District Court abused its discretion in rescinding OPD's appointment of counsel for Ja.H. and denying OPD's motion to appoint counsel after the termination hearing;*

2. *Whether the District Court abused its discretion in concluding that Mother's conduct or condition made her unfit to parent and was unlikely to change within a reasonable time;*

3. *Whether the Department of Health and Human Services made reasonable efforts to prevent the removal of the children and to reunify Mother with her children;*

4. *Whether Mother was denied due process in the termination proceedings.*

¶2 We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3 Mother met Te.H. (Father) when she was a seventeen-year-old runaway from foster care, after being subjected to years of abuse by her family. Father, who was thirty-

---

[1] In the parties' briefing, Je.H. is sometimes referred to as JH1, and Ja.H. is sometimes referred to as JH2.

seven years old at the time, exerted control over Mother and the abuse continued. Mother and Father have three minor children—T.D.H., Je.H., and Ja.H., now ages 14, 12, and 10, respectively—who Father also repeatedly abused. Between 2008 and 2012, the Department of Health and Human Services received twelve reports on the family, including two substantiations that Father physically abused Je.H. and Ja.H. In early 2012, the family agreed to a voluntary services agreement. When that agreement expired on March 6, 2012, the Department determined that there was no substantive improvement in parenting. On April 27, after the children disclosed multiple incidents of psychological and physical abuse by Father to a Department social worker, the Department removed the children from their home and placed them into foster care. Three days after the children were removed, Mother asked Father to move out of the house, which he did.

¶4 On May 4, 2012, the Department filed a petition for emergency protective services and temporary investigative authority for each of the three children due to Father's physical and psychological abuse of the children and Mother's inability to protect the children from Father's abuse. On May 7, the District Court granted emergency protective services. On June 21, the court issued an order continuing emergency protective services and granting temporary investigative authority, to which both parents stipulated. The court also ordered both parents to comply with the Department's requests for examinations, evaluations, counseling, and immediate services. On July 20, the court

3

appointed a Court Appointed Special Advocate (CASA) to represent the children's best interests.

¶5 During the course of the Department's investigation, each child was diagnosed with psychiatric disorders: Je.H. was diagnosed with major depressive disorder, severe posttraumatic stress disorder, oppositional defiant disorder, and borderline intellectual functioning; Ja.H. was diagnosed with oppositional defiant disorder and dysthymic disorder; and T.D.H. was diagnosed with major depressive disorder and parent-child relational problem. All three children originally were placed in foster care but were unable to maintain their foster placements and were transferred to a series of residential treatment facilities and group homes.

¶6 At a hearing on November 5, 2012, the District Court heard testimony from professionals who had worked with Mother and the children that Mother was terrified of Father and Father was harming Mother's efforts to regain custody of her children. After the hearing, the court issued an order granting the Department temporary legal custody for six months, ordering the parents to have no contact with each other, and adjudicating all three children as Youths in Need of Care due to "substantiated physical abuse by [Father], alleged sexual abuse by [Father], and [Mother]'s failure to protect." Neither parent objected to the court's order.

¶7 On December 17, the District Court issued an order approving a treatment plan for Mother (Mother's plan). The plan was signed by Mother and her attorney, and it sought to strengthen the relationship between Mother and her children, to instill long-term

change and lasting stability, and to help Mother develop parenting skills, become educated regarding her children's specific needs, create and maintain a stable lifestyle, and address concerns about domestic violence, mental health, and chemical dependency. Mother's plan contained a list of concrete tasks for Mother to complete, including attending weekly domestic violence support groups, having no contact with Father, signing information releases, participating in a February 1, 2013 psychological evaluation with Dr. Angela Jez, regularly attending individual counseling sessions, scheduling a chemical dependency evaluation by March 1, 2013, and maintaining scheduled visits and phone appointments with her children.

¶8 At a status hearing on February 26, 2013, the Department raised concerns that Mother continued to have contact with Father and had not completed her required psychological evaluation. The Department repeated those concerns at an April 26 status hearing, with counsel stating, "We are approximately one week away from it being a year since these children were removed and we are no closer to reunification today than we were at removal." The Department's counsel noted that the fifteen-month deadline for filing for termination of parental rights set forth under § 41-3-604(1), MCA, was "rapidly approaching." Following the April 26 hearing, the District Court held Mother in contempt of court for having contact with Father and for failing to obtain a psychological examination.

¶9 On May 24, the Department petitioned for an extension of temporary legal custody and documented an exception for not filing for termination after fifteen months of foster

care placement or Department custody. Although Mother was not in compliance with her treatment plan and the children had been in the Department's custody for more than one year, the Department determined that moving to terminate Mother's parental rights was not in the children's best interests at that time. In June, Mother obtained a psychological evaluation with Dr. Edward Trontel, who found no evidence of a psychotic illness. By contrast, when Mother finally completed her required psychological evaluation with Dr. Jez in March 2014, Dr. Jez diagnosed Mother with posttraumatic stress disorder and borderline personality disorder, with a history of borderline intellectual functioning and narcolepsy.

¶10    In August 2013, the District Court granted the Department's petition to terminate Father's rights.[2]    The court also granted the Department a six-month extension of temporary legal custody as to Mother. At Father's termination hearing, T.D.H.'s therapist testified that Mother had begun therapy sessions with T.D.H., which appeared to be going well. Je.H.'s therapist did not recommend contact between Je.H. and Mother at that time because, despite efforts to engage Mother in phone therapy sessions with Je.H., who was placed in a different area of the state, Mother was inconsistent in answering her phone, and attempts to contact Mother caused Je.H. to become agitated and aggressive toward staff.

---

[2] Father appealed the District Court's order terminating his parental rights and, on April 1, 2014, this Court affirmed in a memorandum opinion, *In re J.H.*, 2014 MT 86N, 375 Mont. 551, 346 P.3d 1132.

¶11     On January 15, 2014, the Department filed a petition to extend temporary legal custody for another six months, which the District Court granted. On July 29, the Department finally petitioned for termination of Mother's parental rights. In support of its petition, the Department attached an affidavit from Child Protection Specialist Tom Irvine, stating, "Considering that [Mother] has unsuccessfully completed her treatment plan, her recent drug use, her unstable living conditions, her inability to focus on her children rather than herself during visits, and her inappropriate statements to her children, and [to] service providers including Child and Family Services, the Department has great concerns" about Mother's ability to meet her children's needs. Mother opposed termination, and the court set a termination hearing for December 9, 2014.

¶12     At a pre-hearing attorneys' conference on December 2, the children's counsel, Christina Larsen, advised the District Court that Ja.H. had developed a position against reunification that directly conflicted with the positions of Je.H. and T.D.H. Unlike his siblings, Ja.H. did not want to return to his mother. Larsen said she did not feel that she could advocate simultaneously for two irreconcilable positions. The Department opposed appointing a new counsel, stating that it had "a grave concern regarding additional delays in this matter," as the children already had been in the Department's care for thirty-two months. The Department noted that Ja.H. had a CASA who could represent his best interests. After a lengthy discussion, Larsen agreed with the Department's statement that Ja.H.'s "position is in line with what the Department is advocating," and that his interests were adequately represented without an attorney. On December 3, OPD filed a Notice of

Reassignment of Counsel for Ja.H., appointing Kathryn McEnery, who filed a Notice of Appearance and Motion for Continuance. On December 4, the District Court issued an order rescinding OPD's appointment of McEnery as Ja.H.'s attorney.

¶13 At the beginning of the December 9 termination hearing, Larsen voiced her concern that, going forward, "there will still be a case for [Ja.H.] no matter what the outcome is today," and said she hoped that "counsel could be appointed for him to advocate for his interest in future permanency plan hearings." The Department responded that the appointed CASA "will continue to advocate for the child even after termination."

¶14 During the hearing, the court heard testimony from several professionals who worked with Mother and her children regarding Mother's progress on her parenting plan. Mother had made progress on certain parenting plan tasks. For example, she started attending counseling sessions at Sunburst Mental Health Services (Sunburst), signed requested information releases, and participated in a parenting class appropriate to her children's needs. However, Mother had not complied with many of her plan's requirements. Mother told the Department that she was attending a weekly domestic violence support group, but the social worker who supervised Mother's case testified that Mother did not document her attendance or provide the group leader's contact information as required by her plan. Therefore, the Department was unable to verify Mother's attendance at the support group. The Department also had concerns that Mother was still in contact with Father. Mother's plan required her to abstain from

8

alcohol and drug use, but Mother admitted to using marijuana and tested positive for THC and methamphetamines in drug tests in the spring of 2014. A Department employee testified that the Department's background check on Mother's current boyfriend showed a domestic violence charge from before he met Mother. And Mother told both the Department and her children that she had been diagnosed with cancer when there was no such diagnosis and Mother later admitted that she did not have cancer.

¶15 The District Court also heard testimony regarding Mother's relationship with her children. A Department supervisor testified that, in the spring of 2014, Mother said she could not take care of the children because of their special needs. Mother's counselor at Sunburst testified that, since meeting with Mother, Mother had become physically healthier, better at prioritizing and setting boundaries, and more assertive and proactive. However, the counselor also testified that there was a three-month gap in the summer of 2014 where Mother was not attending therapy sessions due to her need to focus on meeting her own basic needs. Ryan Nolan, Director of Intermountain Providence Group Home (Providence), where T.D.H. and Ja.H. were placed, testified that Mother did not consistently attend scheduled visits or family therapy sessions with T.D.H. and Ja.H. and that, despite significant hands-on work with Mother in the sessions she did attend, her parenting techniques did not improve. In July 2014, Mother was asked to leave Providence after she verbally abused a therapist. One week after that incident, the therapist contacted Mother to review the situation and reinstate visits, but Mother said she would not speak to employees at Providence without her attorney, and she did not contact

9

Providence again until September 2014. Thus, there were no visits between Mother and T.D.H. or Ja.H. between July and October 2014.

¶16 Following the termination hearing, on December 10, 2014, OPD moved to appoint counsel for Ja.H. and requested a hearing. The Department opposed the motion and request. On December 18, the District Court issued two orders. In the first order, the court denied OPD's motion to appoint counsel. In the second, the court granted the Department's petition to terminate Mother's parental rights.

¶17 In early 2015, OPD filed a notice of appeal and notice of appearance on behalf of Ja.H. OPD challenges the District Court's December 4 order rescinding OPD's appointment of McEnery to represent Ja.H. and its December 18 order denying OPD's motion to appoint counsel for Ja.H. The Department moved to dismiss OPD's appeal. On April 14, 2015, this Court issued an order stating that it would take the Department's motion to dismiss under advisement until both issues—termination of Mother's parental rights and appointment of counsel for Ja.H.—were fully briefed. Mother and T.D.H. appealed the District Court's December 18 order terminating Mother's parental rights, and the issues have been fully briefed.

## STANDARDS OF REVIEW

¶18 "We review a district court's decision to terminate parental rights for abuse of discretion." *In re L.N.*, 2014 MT 187, ¶ 12, 375 Mont. 480, 329 P.3d 598 (citation omitted). We review a district court's findings of fact for clear error. *L.N.*, ¶ 12. A parent's right to the care and custody of a child is a fundamental liberty interest that must

be protected by fundamentally fair procedures. *In re D.B.*, 2007 MT 246, ¶ 17, 339 Mont. 240, 168 P.3d 691. However, a child's best interests take precedence over parental rights. *In re Matter of E.K.*, 2001 MT 279, ¶ 33, 307 Mont. 328, 37 P.3d 690. A district court must give primary consideration to the "physical, mental, and emotional conditions and needs of the child." Section 41-3-609(3), MCA.

¶19 Issues of justiciability are questions of law that we review de novo. *Chipman v. Nw. Healthcare Corp.*, 2012 MT 242, ¶ 16, 366 Mont. 450, 288 P.3d 193.

## DISCUSSION

¶20 *1. Whether the District Court abused its discretion in rescinding OPD's appointment of counsel for Ja.H. and denying OPD's motion to appoint counsel after the termination hearing.*

¶21 OPD requests that this Court vacate and remand the District Court's December 4, 2014 order rescinding OPD's appointment of Ja.H.'s attorney and its December 18, 2014 orders denying OPD's motion to appoint counsel and terminating Mother's parental rights, arguing that those decisions violated Ja.H.'s constitutional right to counsel.

¶22 We generally do not consider issues raised for the first time on appeal. *In re J.G.*, 2004 MT 104, ¶ 27, 321 Mont. 54, 89 P.3d 11. Larsen said she felt she could no longer represent Ja.H. at the December 2, 2014 attorneys' conference, which was heard before the District Court judge and attended by counsel for the Department, the CASA, counsel from OPD on behalf of Mother, and Larsen. However, Larsen ultimately agreed with the Department that Ja.H.'s interests during the termination hearing would not be lost without an attorney because his position aligned with that of the Department. No one present at

11

the hearing objected to the Court's decision to rescind OPD's appointment of counsel to Ja.H.

¶23 Likewise, there were no objections to Ja.H.'s lack of counsel at the December 9 termination hearing. Larsen stated that her "only concern is that going forward with the case *after today* there will still be a case for [Ja.H.] no matter what the outcome is today, and I would hope that counsel could be appointed for him to advocate for his interest in *future* permanency plan hearings." (Emphasis added.) She did not appear to contest the court's decision not to appoint counsel to Ja.H. at that time. Accordingly, the court proceeded to conduct the hearing.

¶24 In its brief on appeal, OPD does not allege that Ja.H. suffered a redressable injury because of the District Court's decisions. Under the Montana Constitution, a court lacks power to resolve a case brought by a plaintiff who does not show "that he has personally been injured or threatened with immediate injury by [an] alleged constitutional or statutory violation." *Olson v. Dep't of Revenue*, 223 Mont. 464, 470, 726 P.2d 1162, 1166 (1986). We further have recognized the prudential rule that a litigant may assert only his own constitutional rights. *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 33, 360 Mont. 207, 255 P.3d 80 (citations omitted). By OPD's own admission, Ja.H.'s interests were served by terminating Mother's parental rights. Confusingly, though the District Court reached that very outcome, OPD concludes in its opening brief, "The Youth requests remand with further proceedings consistent with this opinion." OPD does not explain how remanding this case for further proceedings would be in Ja.H.'s interests,

12

when a dedicated advocate for his interests would have sought the very result that the District Court reached. Nor does the Dissent suggest effective relief that could be afforded Ja.H. on remand. Were we able to conclude that Ja.H. had suffered the deprivation of a right that could be redressed through the relief sought, OPD's and the Dissent's arguments may merit consideration. Given the District Court's judgment terminating parental rights, however, the discussion is hypothetical.

¶25 OPD also appears to argue that Ja.H.'s constitutional rights will be violated if he is not assigned counsel to represent his interests during future proceedings. In order to present a justiciable controversy, a petitioner must have "existing and genuine, as distinguished from theoretical, rights or interests." *Gryczan v. State*, 283 Mont. 433, 442, 942 P.2d 112, 117 (1997). It is not at all clear that Ja.H. will remain unrepresented in future proceedings, or that his interests will continue to conflict with those of his siblings. Again, OPD, purportedly on behalf of Ja.H., asserts a hypothetical future injury and is not entitled to an advisory opinion.

¶26 Under these circumstances, we decline to address the merits of OPD's argument that every child is entitled to independent counsel in a youth in need of care case.

¶27 *2. Whether the District Court abused its discretion in concluding that Mother's conduct or condition made her unfit to parent and was unlikely to change within a reasonable time.*

¶28 Under § 41-3-609(1)(f), MCA, a district court may terminate parental rights if it finds, by clear and convincing evidence, that the child is an adjudicated youth in need of care, that "an appropriate treatment plan that has been approved by the court has not been

13

complied with by the parents or has not been successful," and that "the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time." In parental rights cases, clear and convincing evidence means that a preponderance of the evidence must be definite or that a particular issue must be established by a clear preponderance of proof. *D.B.*, ¶ 29 (citation omitted). This standard "does not call for unanswerable or conclusive evidence." *In re J.M.W.E.H.*, 1998 MT 18, ¶ 33, 287 Mont. 239, 954 P.2d 26 (quoting *In re J.L.*, 277 Mont. 284, 289, 922 P.2d 459, 462 (1996)).

¶29 The District Court found that Mother was unfit to parent in light of her mental deficiencies, lack of participation in recommended domestic violence education and therapy, inability to engage in meaningful and consistent mental health therapy, and unresolved chemical dependency issues, and that these conditions were unlikely to change within a reasonable time. Mother argues that the District Court abused its discretion in terminating her parental rights because the court impermissibly considered factors outside of the conduct or condition that led to the Department's involvement, and that the Department did not present clear and convincing evidence that her parental unfitness was unlikely to change within a reasonable time.

> *A. Whether the District Court's evaluation of Mother's parental unfitness was limited to the conduct or condition that led to the Department's involvement.*

¶30 In *J.G.*, ¶ 20, we stated,

> While a child may initially be removed for one specific reason, it is proper for the Department to determine other causes of abuse and neglect during the proceedings because the purpose of the proceedings is to protect the

14

child. If the Department were limited to the reason the children were first removed, the Department would be unduly restricted in actually helping the children. At the same time, . . . parents are entitled to proper notice before their rights are terminated.

Though Mother argues that she did not have notice that the Department would consider factors beyond her inability to protect her children, her plan specifically provided, "The consequence of a failed treatment plan may be that the Department will petition for termination of [Mother's] parental rights." By Mother's own admission, the numerous goals and tasks set forth in Mother's plan were aimed at more than her inability to protect her children from Father.[3]

¶31 The Department twice moved for extensions of temporary legal custody after the court approved Mother's plan, each time noting that the children could not yet return home because Mother had not yet complied with her plan. In its May 2013 documented exception for not seeking termination under § 41-3-604(1)(c), MCA, the Department stated:

> Although [Mother] has not yet begun to comply with her treatment plan . . . termination of [Mother]'s parental rights is not believed to be in the child's best interests at this time.
>
> .    .    .
>
> In order for the child[ren] to be returned[, Mother] needs to comply with and complete her treatment plan to the satisfaction of the Department and professionals working with her children.

---

[3] To the extent Mother contends that her treatment plan was inappropriate, "[a] parent who does not object to a treatment plan's goals or tasks waives the right to argue on appeal that the plan was not appropriate." *In re D.S.B.*, 2013 MT 112, ¶ 10, 310 Mont. 37, 300 P.3d 702 (quoting *In re H.R.*, 2012 MT 290, ¶ 10, 367 Mont. 338, 291 P.3d 583). Mother stipulated to her treatment plan while represented by counsel and never objected to any of her unfulfilled tasks. Accordingly, we will not consider a challenge to the appropriateness of Mother's plan.

In its August 21, 2013 orders extending temporary legal custody, the court stated:

> [Mother] has made little progress on her treatment plan. [Mother] has obtained her psychological evaluation, but it took near[ly] 15 months of requests by the Department and several court orders to accomplish this task. [Mother] is currently only in telephone contact with one of her children. An extension of Temporary Legal Custody for an additional six (6) months is necessary in order for [Mother] to complete [her] plan.
>
> .   .   .
>
> [The children] cannot be returned to the home until [Mother] completes her treatment plan . . . .

At the termination hearing, the court heard testimony from a Department supervisor that, earlier that year, Mother acknowledged the special needs of her children and her inability to meet them. In a broad sense, the goals and objectives of the treatment plan all were designed to protect the children. That Mother succeeded in removing Father from the home did not establish success in achieving conditions that would allow the children's "safe return" to her custody. *See* § 41-3-443(2)(b), MCA. The Department and the District Court clearly were concerned that factors beyond Mother's inability to protect made her unfit to be a parent.

¶32 Though the Department's reason for initial involvement with the family was Father's abuse of the children and Mother's inability to protect them, the court's evaluation of Mother's parental unfitness was not limited to those issues. Mother had sufficient notice that the Department would consider multiple factors when deciding whether to seek termination.

16

*B. Whether the Department presented clear and convincing evidence that Mother's conduct or condition rendering her unfit was unlikely to change in a reasonable time.*

¶33 In terminating parental rights, a district court must enter a finding that continuing the parent-child legal relationship "will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care." Section 41-3-609(2), MCA. This requirement necessitates that the court consider several factors including, but not limited to, the parent's "emotional illness, mental illness, or mental deficiency . . . of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time." Section 41-3-609(2)(a), MCA. The court must consider "past and present conduct of the parent," *In re J.C.*, 2003 MT 369, ¶ 11, 319 Mont. 112, 82 P.3d 900, and "give primary consideration to the physical, mental, and emotional conditions and needs of the child," § 41-3-609(3), MCA.

¶34 Although Mother and T.D.H. argue that the District Court improperly relied on testimony by certain experts over others in determining that Mother's conduct or condition rendering her unfit to parent was unlikely to change in a reasonable time, a district court has discretion to weigh expert testimony and determine witness credibility. *J.M.W.E.H.*, ¶ 34. This Court does not "substitute [its] evaluation of the evidence for that of the trial court, or pass upon the credibility of witnesses." *J.M.W.E.H.*, ¶ 34 (quoting *J.L.*, 277 Mont. at 290, 922 P.2d at 462). The existence of conflicting evidence or conflicting professional opinions concerning a required finding "does not preclude a trial

17

court's determination that clear and convincing evidence exists to support a finding of fact." *In re M.F.B.*, 2001 MT 136, ¶ 19, 305 Mont. 481, 29 P.3d 480 (citations omitted).

¶35 Substantial evidence supported the District Court's finding that Mother's unfitness to parent was unlikely to change in light of her mental deficiencies, lack of participation in recommended domestic violence education and therapy, inability to engage in meaningful and consistent mental health therapy, and unresolved chemical dependency issues.[4] Although T.D.H. argues that the record does not establish that cognitive delays or mental deficiencies made Mother unfit to parent or that Mother was unable to engage in meaningful and consistent mental health therapy, the District Court cited testimony that, although Mother self-reported her history of mental illness, she failed to actively engage in mental health evaluations and treatments by missing appointments and therapy sessions and delaying evaluations, and she did not participate in family counseling to improve her parenting skills and her ability to care for her children. Nolan testified that Mother missed many of her scheduled family therapy sessions, lied to her children about having terminal brain cancer, was unable to follow staff directions, attended visits smelling of marijuana, consistently arrived late, and appeared unable to provide the strong, assertive caregiving with consistency, structure, and supervision that her children required.

¶36 Mother also argues that the District Court did not adequately consider the best interests of each individual child because it issued near-identical termination orders for

---

[4] While Mother's chemical dependency evaluation showed no chemical dependency or substance abuse problems, as noted, she later tested positive for THC and methamphetamines.

all three children. However, the court noted that Je.H. was currently in a high-level care facility where her therapy focused on stabilization, and that she would likely need to stay there for at least six months before being discharged to a lower level of care. The court further stated that Ja.H., who was at Providence, had "come a long way" in his treatment and was ready to transition to a therapeutic foster home, and that T.D.H., also at Providence, treated women poorly, was controlling and aggressive, and had additional work to do before he could be placed in a family setting.

¶37 The District Court properly evaluated testimony from professionals who worked with Mother and the children. The court did not abuse its discretion in concluding that Mother was unable to meet her children's complicated needs and would be unable to do so in the foreseeable future.

¶38 *3. Whether the Department made reasonable efforts to prevent the removal of the children and to reunite Mother with her children.*

¶39 Mother contends that she was deprived of her fundamental liberty interest in the care and custody of her children because the Department did not make reasonable efforts to prevent the removal of her children from her or to reunite her with her children. She further contends that she was deprived of due process because the Department did not provide consistent services or adequately address her history as a victim of domestic violence.

19

*A. Whether the Department made reasonable efforts to prevent removal of the children from Mother.*

¶40    If, while investigating alleged abuse or neglect, the Department determines that a child is in danger or needs protection from partner assault against a parent, "the [D]epartment shall take appropriate steps for the protection of the child, which may include . . . making reasonable efforts to protect the child and prevent the removal of the child" from the parent who is a victim of the assault and "to remove the person who allegedly committed the . . . assault from the child's residence."  Section 41-3-301(2), MCA.

¶41    To the extent that Mother contends that the Department did not make reasonable efforts to prevent the removal of her children, the District Court noted in its November 13, 2012 orders adjudicating the children as Youths in Need of Care and granting temporary legal custody to the Department that Mother and Father "agree that the Department has made reasonable efforts . . . to prevent the removal of the child[ren] from the home and to make it possible for the child[ren] to be safely returned home."  Mother was represented by counsel and did not object to the Department's removal of her children.  Because Mother raises the issue whether the Department made reasonable efforts to prevent removal of her children for the first time on appeal, we will not address it.  *See J.G.*, ¶ 20.

*B. Whether the Department made reasonable efforts to reunite Mother with her children.*

¶42 Under § 41-3-423(1), MCA, the Department must make "reasonable efforts" to reunite families that it has separated. "Reasonable efforts include but are not limited to voluntary protective services agreements, development of individual written case plans specifying state efforts to reunify families, . . . provision of services pursuant to a case plan, and periodic review of each case to ensure timely progress toward reunification . . . ." Section 41-3-423(1), MCA. "Although the State may assist the parents in completing the treatment program, the parents retain the ultimate responsibility for complying with the plan." *In re R.H.*, 250 Mont. 164, 171, 819 P.2d 152, 156 (1991) (citing *In re L.W.K.*, 236 Mont. 14, 19, 767 P.2d 1338, 1342 (1989)).

¶43 Mother contends that the Department did not make reasonable efforts to reunite her with her children, noting that, on November 8, 2013, she filed a "Motion for Reasonable Efforts," asking the District Court to compel the Department to allow her to visit her children. During a hearing on that motion, the Department said it was moving forward with visitation between Mother and Ja.H. and T.D.H., and Mother's attorney noted that the Department was making progress on visitations. Although Mother contends that the Department failed to provide Mother with adequate contact, the court was presented with testimony that Mother failed to show up for several months of scheduled visitations shortly before the Department filed for termination. Moreover, Mother did not object to the Department's reasonable efforts during hearings on extending temporary legal custody.

21

¶44 The court found that the Department made "reasonable efforts" to reunite Mother with her children by providing, among other services, individual counseling and therapy sessions, in part to address Mother's own victimization and related issues; accountability for attending a domestic violence therapy group; family sessions and one-on-one visitation through Providence; case management for Mother through family concepts and for the children through Youth Dynamics; psychological evaluations for Mother; a parent-child interaction evaluation for Mother and Ja.H.; 123 Magic Parenting classes; a chemical dependency evaluation; regular contact with service providers; regular home visits with the children; transportation assistance; family group decision-making meetings; and regular permanency planning. Mother has not explained how the Department's efforts were not "reasonable," or what more the Department should have done in terms of specific domestic violence treatment. Though T.D.H. argues that Mother should have been given more time, by the termination hearing the children had been in the Department's custody for thirty-two months. This is more than double the fifteen-month deadline for filing for termination, barring a documented exception. *See* § 41-3-604(1), MCA. At the termination hearing, Pat Sylvia, a child protection specialist supervisor at the Department, testified that the Department delayed seeking termination because it recognized that Mother needed time to meet her own needs, particularly given her history as a victim of domestic violence, and to recover from Father's control and learn how to parent alone.

22

¶45 The District Court properly considered the multiple services provided by the Department to aid in reuniting Mother with her children, as well as Mother's decision not to actively participate in several of those services. The court did not err in finding that the Department made reasonable efforts to reunite Mother with her children.

¶46 *4. Whether Mother was denied due process in the termination proceedings.*

¶47 Effectuating an appropriate treatment plan requires the Department "to act in good faith . . . to preserve the parent-child relationship and the family unit," a requirement that "does not end once the court has approved [the] treatment plan." *D.B.*, ¶ 33 (citations omitted). Mother argues that that the Department did not execute her plan in good faith because it did not adequately account for her history as a victim of domestic violence, and because she was assigned six different child protection specialists during the course of her case.

¶48 Section 41-3-301(3), MCA, provides, "If the [D]epartment determines that an adult member of the household is the victim of partner or family member assault, the department shall provide the adult victim with a referral to a domestic violence program." When Mother's plan was created, Mother told the Department that she already was attending a domestic violence support group. Although both T.D.H. and Mother contend that the Department did not take Mother's history as a victim of domestic violence into consideration, Mother's treatment plan required Mother to continue to attend her domestic violence support group on a weekly basis, to document her attendance, and to provide the Department with a supervisor's contact information. Mother did not

complete those tasks. Each time the Department petitioned for an extension of temporary legal custody, it attached an affidavit by Mother's case worker discussing her domestic violence history and how the Department was helping her to address that history.

¶49    In addition, Mother was represented by counsel at each of the multiple hearings held to discuss the Department's requests for extension of temporary legal custody and reunification efforts. The Department's decision to supervise Mother's visits given her observed inability to address her children's complex needs was not a violation of her due process rights. As discussed above, though Mother contends that she was denied contact with her children, Mother's own choices, actions, and inactions resulted in a three-month period in 2014 during which she did not visit with her children. Clearly, it would be preferable to maintain continuity in case management services, particularly for a vulnerable parent. In this case, however, given the Department's efforts to reunite the family and its provision of numerous reunification services, the fact that Mother was assigned multiple case workers throughout the proceedings does not in itself establish a due process violation.

¶50    Mother unquestionably has been a victim of longstanding abuse, which has directly contributed to the problems that led to the removal of her children and her difficulty in recovering or developing the skills needed to successfully parent. But in this proceeding, Mother was afforded fundamentally fair procedures; she was not successful in taking advantage of the offered services, and her children needed permanency. Mother was not denied her due process rights.

24

¶51 We affirm the District Court's December 4, 2014 order rescinding OPD's appointment of counsel for Ja.H., its December 18, 2014 order denying OPD's motion to appoint counsel for Ja.H., and its December 18, 2014 order terminating Mother's parental rights to Ja.H., Je.H., and T.D.H.


/S/ BETH BAKER

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ PATRICIA COTTER
/S/ JIM RICE


Justice Laurie McKinnon, concurring and dissenting.

¶52 I strongly believe that a competent child, possessing a fundamental liberty interest in proceedings to terminate the rights of his parents, is denied due process guaranteed by the Montana Constitution when his voice in those proceedings is not represented by counsel. I disagree that the issue regarding rescission of counsel for Ja.H. is not properly before this Court.

**A. Waiver**

¶53 Ja.H. was nine years old when the court held its hearing to terminate the parental rights of his mother. Ja.H. is the youngest child of three children, all of whom had been removed due to physical and sexual abuse by the birth father and Mother's failure to protect or to make adequate improvements in her parenting skills. Ja.H. was diagnosed

25

with Oppositional Defiant Disorder and Dysthymic Disorder. He has a sibling one year older and three years older, both of whom have been diagnosed with severe mental health problems. The children have been unable to maintain foster home placements and have required psychiatric care, some of which has necessitated placements in therapeutic group homes, institutional facilities, and/or Shodair hospital.

¶54 As the termination hearing for his mother approached, Ja.H. became concerned about its outcome. In particular, Ja.H. did not want to be returned to his mother and was anxious about articulating his wishes because they were inconsistent with those of his older siblings. Ja.H. expressed that he wanted the judge to know he did not want to go back to his mother, but he did not want his siblings to know he had taken this position. In an attempt to ensure he was heard, Ja.H. wrote a letter to the judge stating where he wanted to be placed. Ja.H. also asked to speak to the judge privately in chambers. He subsequently was relieved to learn his older brother was not displeased with him for having taken a position against their mother.

¶55 It is important to take a step back and look at these proceedings from the vantage point of Ja.H. In my view, the dilemma Ja.H. faced was unimaginable: at the age of nine, Ja.H. had to abandon and betray every member of his family in what, he believed, was a request necessary for self-preservation. His voice, concerns, thoughts, and wishes were worthy of representation by counsel, regardless of whether they aligned with another party's position. The empowerment of a child competent to express his views, is critical to improving the outcomes of adversarial proceeding affecting his life. It makes no

3

difference what that opinion or view is; rather, it is the fact that his voice has been heard by the court, which—at least in the eyes of the child—may perhaps provide some legitimacy for the decision ultimately made by the court. Ja.H., at age nine and in every way he knew how, was attempting to get the court to listen to him.

¶56 Initially, the proceedings got off to the right start. Counsel was appointed for the children when the petition for emergency protective services was first filed. The court also had the assistance of a GAL. At an Attorney's Conference on December 2, 2014, however, counsel for Ja.H., Christina Larsen, advised the court that Ja.H.'s expressed wish not to be returned to his mother placed counsel in an irreconcilable position with Ja.H.'s siblings. Larsen advised that the OPD would be assigning new conflict counsel. The State, expressing concern over the potential delay which would likely accompany a late appointment, urged the Court to rescind the appointment.[1] The State's oral motion to rescind was unaccompanied by any notice to Ja.H. that he would be unrepresented at the termination hearing. No hearing was conducted by the court which ascertained what Ja.H.'s wishes might be regarding new counsel. Ja.H. was now unrepresented, based upon his previous counsel's conflict, and the decision regarding new counsel was made without actual notice to Ja.H., an opportunity to be heard from Ja.H., or any opportunity for new counsel to advise Ja.H. regarding these developments.

---

[1] The State argued in the District Court that they were entitled to have the appointment of counsel for Ja.H. rescinded because the State had been the party initially requesting appointment of counsel. Such an audacious suggestion underscores the problems in these proceedings and demonstrates a fundamental misunderstanding of the child's constitutional and statutory right to counsel.

4

¶57 Larsen's comment at the December 2, 2014 conference—"Sure"—has been seized upon by this Court and taken out of context from the events of the hearing. Larsen had repeatedly insisted that she could not represent Ja.H. because of the "irreconcilable positions" of the siblings. She made abundantly clear her discomfort with continuing to represent Ja.H.. Nevertheless, through persistence of the State in its belief that the State could represent Ja.H.'s interest and with the termination hearing pending, the following has been relied upon by the Court for finding the objection was not preserved:

> Ms. von Jentzen: But the Department would oppose a new attorney being appointed at this time a week to go to the termination hearing.
> The Court: We, that – that would work, wouldn't it?
> Ms. Larsen: Yeah, I just - -
> The Court: Okay.
> Ms. Larsen: - - I don't feel like I can go forward representing the two – two points of view that are in my mind absolutely at odds.
> The Court: Well, and [Ja.H.] – there's no issue about that. He – does not want to go home to mom.
> Ms. von Jentzen: He does not wish to go home, Your Honor, and that position is in line with what the Department is advocating, so I – I don't believe that his interests will be lost without an attorney.
> The Court: Okay. Okay. So that would work then, right?
> Ms. Larsen: Sure.

¶58 In relying upon this colloquy, the Court has overlooked that once Larsen requested new counsel from the OPD she no longer could represent Ja.H. and, accordingly, could not waive his right to an attorney or agree on behalf of Ja.H. that the State could represent his interests. M. R. Prof. Cond. 1.7(a) ("[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict exists if . . . the representation of one client will be directly adverse to another client."). Larsen had already presented her "irreconcilable" conflict to the court and advised that new

5

counsel would be assigned when she agreed "that would work." At the point Larsen made this representation, she was not free to represent Ja.H.'s position regarding how to proceed with the termination hearing. While OPD continued its representation of Ja.H., as it had done for the past two years, it was now through new counsel, Kathryn McEnery.

¶59 The next day, on December 3, 2014, the OPD filed a Notice of Reassignment with the court indicating that Kathryn McEnery would be counsel for Ja.H. Also on December 3, 2014, Ms. McEnery filed a notice of appearance and a request for a continuance. On December 4, 2014, the District Court issued an order rescinding the appointment of counsel for Ja.H. without any inquiry from Ja.H.'s new counsel, McEnery, regarding the State's request. The court proceeded to the December 9, 2014 termination hearing.

¶60 At the beginning of the termination hearing, Larsen renewed her request to have counsel appointed for Ja.H. Larsen requested that Ja.H. have counsel appointed "to advocate for his interest in future permanency hearings." On December 10, 2014, following the termination hearing, the OPD filed a Motion to Appoint Counsel and Request for Hearing. The motion was accompanied by a brief presenting the same arguments which have been advanced on appeal. The District Court denied the OPD's motion and terminated Mother's parental rights on December 18, 2014.

¶61 Based on this record, the issue of Ja.H.'s appointment of counsel has been preserved. The Court seizes upon a portion of the record, taking it out of context from the hearing and the proceedings overall, to conclude that the issue of Ja.H.'s right to counsel was not preserved. The Court is mistaken in its conclusion when neither Ja.H.

6

nor counsel, competent to make the objection, were present at the December 2, 2014 hearing. Only the State's position—that it could adequately represent Ja.H.'s interests because it was seeking termination—was before the court. Such a position blatantly disregards the stated policy of Montana that "recognizes . . . a *child* is entitled to assert the child's constitutional rights." Section 41-3-101(1)(d), MCA. (Emphasis added). Moreover, despite having counsel for over two years, none of the requirements of §§ 37-61-403 through -405, MCA, or M. Unif. Dist. Ct. R. 10 were considered. Indeed, the provisions of § 47-1-111(1)(c), MCA, governing appointment of the OPD require that the OPD must remain as counsel until the court issues an order rescinding its assignment.

¶62 The Court's analysis begs the question: How is a nine year old child, who is unquestionably a party to the termination of his mother's parental rights, to realize his right of appeal where the Court has improperly rescinded his legal representation? How can an attorney who has an irreconcilable conflict in her representation of the child thereafter agree, on that child's behalf, that the proceedings may go forward without representation for the child—especially when the child's need for representation had remained unquestioned for over two years? How is the stated policy of Montana "recognize[ing] that a child is entitled to assert the child's constitutional rights," § 41-3-101(1)(d), MCA, realized when that voice is silenced by the rescission of appointed counsel? In my opinion, the Court's analysis is circuitous and fails to appreciate the magnitude of the right involved, the age of the party, Ja.H.'s attempts to engage the court, the circumstances surrounding the alleged waiver, the appointment

7

statute of the OPD, and Montana's Rules of Professional Conduct governing conflicts and representation.

¶63 As a final consideration concerning waiver, on December 10, 2014, appointment of counsel for Ja.H. was requested for purposes of permanency determinations. Neither the child nor the legal process ceases to exist following termination of parental rights. A child's fundamental liberty interest in health, safety, and family integrity remain and are clearly at stake in permanency hearings where a child is subject to a wide array of foster care placements, including institutional facilities where a child's physical liberties are greatly restricted. These liberty interests appear to support a due process right to counsel throughout the dependency proceedings, including considerations of permanency.

B. **Right to Counsel**

¶64 Montana Constitution Article II, Section 15 provides:

> Rights of persons not adults. The rights of persons under 18 years of age shall include, but not be limited to, all the fundamental rights of this Article unless specifically precluded by laws which enhance the protections of such person.

This section must be read in conjunction with the guarantee of equal protection found in Montana Constitution Article II, Section 4. As we indicated in *In re S.L.M.*, 287 Mont. 23, 951 P.2d 1365 (1997), the primary purpose of Montana Constitution Article II, Section 15 was to remedy the fact that minors had not been accorded full recognition under the equal protection clause of the United States Constitution. To explain, once again, the Bill of Rights Committee's Comments were as follows:

8

The committee took this action in recognition of the fact that young people have not been held to possess basic civil rights. Although it has been held that they are "persons" under the due process clause of the Fourteenth Amendment, the Supreme Court has not ruled in their favor under the equal protection clause of that same amendment. What this means is that persons under the age of majority have been accorded certain specific rights which are felt to be a part of due process. However, the broad outline of the kinds of rights young people possess does not yet exist. This is the crux of the committee proposal: to recognize that persons under the age of majority have the same protections from governmental and majoritarian abuses as do adults. In such cases where protection of the special status of minors demands it, exceptions can be made on clear showing that such protection is being enhanced.

Montana Constitutional Convention, Vol. II at 635-36.

¶65    We stated, "[c]learly . . . minors are afforded full recognition under the equal protection clause and enjoy all the fundamental rights of an adult under Montana Constitution Article II. Furthermore, if the legislature seeks to carve exceptions to this guarantee, it must not only show a compelling state interest but must also show that the exception is designed to enhance the rights of minors." *S.L.M.*, 287 Mont. at 23, 951 P.2d at 1373.

¶66    A child's right to counsel in dependency proceedings is merely a corollary to the corresponding right of counsel for parents in these same proceedings. Both have fundamental constitutional interests at stake. We recognized in *Matter of R.B.*, 217 Mont. 99, 102-3, 703 P.2d 846, 848 (1985), that a natural parent's right to the care and custody of his or her child is a fundamental liberty interest and that a parent must be afforded fundamentally fair procedures when the State moves to terminate a parent's rights. The guarantee of fundamental fairness in judicial proceedings to terminate parental rights has

9

as its source our State Constitution. *See* Mont. Const. art. II, § 17. "Fairness requires that a parent, like the State, be represented by counsel at parental termination proceedings. Without representation, a parent would not have an equal opportunity to present evidence and scrutinize the State's evidence." *Matter of A.S.a.*, 258 Mont. 194, 198, 852 P.2d 127 (1993). A child has a corresponding interest in his or her own safety, health, and well-being. That interest includes maintaining the integrity of the family unit and having a relationship with his or her biological parents. In addition to principles of fundamental fairness, the right to counsel is assigned to both the interests of parents and a child in order to ensure that an erroneous decision is not made that a child is abused or that parental rights should be terminated which would lead to destruction of the child's most important family relationships. The appointment of counsel effectively mitigates the risk of these errors.

¶67 In 2011, the legislature amended § 41-3-425(3), MCA, to provide a GAL exception to a child's right to counsel. Previously, Montana's statutory scheme required that in a termination proceeding, the child must be appointed counsel pursuant to § 41-3-425(2)(b), MCA, and, separately, a GAL was to be appointed pursuant to § 41-3-112(1), MCA. The amendment removed the mandatory language requiring appointment of counsel for a child and provided the court discretion to appoint counsel, if a GAL were also appointed. Because a child is "afforded full recognition under the equal protection clause and enjoys all fundamental rights of an adult," if the legislature "seeks to carve out exceptions to this guarantee, it must not only show a compelling state interest

but must also show that the exception is designed to enhance the rights of minors." *S.L.M.*, 287 Mont. at 23, 951 P.2d at 1373. To the extent the statutory scheme premises the discretion for appointing counsel upon appointment of a GAL, it cannot be "designed to enhance the rights of minors" and I would conclude it is inconsistent with Montana Constitution Article II, Section 15 and prior decisions of this Court. A GAL is not a substitute for counsel.

¶68 We have consistently recognized that the duties of the GAL are separate and distinct from those of counsel for child. *In re K.H.*, 2012 MT 175, ¶ 27, 366 Mont. 18, 285 P.3d 474 (holding that "counsel and the GAL did not have identical roles"). GALs are an extension of the district court and are appointed and funded by the courts. Sections 41-5-111(3), and -112(1), MCA. The GAL reports to the court and general duties of a GAL include investigations to ascertain facts, interviewing and observing the child, accessing records, making written reports to the court, and making recommendations as to the child's best interests. *See* § 41-3-112(3), MCA. They "shall" "perform other duties as directed by the court." Section 41-3-112(3)(g), MCA. A GAL may not file motions with the district court and the GAL statute does not authorize a GAL to appeal district court decisions to this Court for the affected child. Most importantly, GALs serve to provide guidance to the district court regarding the child's best interests, which may or may not coincide with the wishes of the child; that is, GALs are not advocates for the child's wishes. They do not have an attorney-client relationship

with the child and, accordingly, no privilege of confidentiality is associated with conversations between the child and a GAL.

¶69 In contrast, an attorney for a child may appeal and file motions on the child's behalf. *See K.H.*, ¶¶ 28-31; §§ 47-1-104(4)(b)(i), 41-3-425(2), MCA. Discussions between an attorney and the child are confidential and protected by the attorney-client privilege. Section 26-1-803, MCA. A child's attorney is tasked with representing the wishes of the child and must abide by the child's wishes concerning the objectives of representation. M. R. Prof. Cond. 1.2(a); *see also* 2011 Model Act Governing the Representation of Children in Abuse, Neglect, and Dependency Proceedings § 7(c) and (d), and Commentary, American Bar Association; National Conference of Commissioners on Uniform State Laws, 2007 Uniform Representation of Children in Abuse, Neglect, and Custody Proceedings Act, Sec. 2(2). In light of these differences, a "best interest" advocate does not replace a lawyer for a child. Providing a child with independent and client-directed counsel ensures the child's legal rights and interests are adequately protected.

¶70 Therefore, to the extent § 41-3-425(3), MCA, provides a GAL exception to the appointment of counsel for a child, it is not "designed to enhance the rights of minors." *S.L.M.*, 287 Mont. at 23, 951 P.2d at 1373. The 2011 amendment to § 41-3-425, MCA, on this basis alone, is incompatible with our constitutional protections to be afforded a child in dependency proceedings. While unnecessary to address whether the State can demonstrate a compelling interest for the GAL exception, given a child's fundamental

liberty interest is not enhanced by carving out an exception to appointment of counsel, I hasten to add that a child's fundamental interest in being heard in proceedings affecting his life far outweighs any fiscal or administrative burden that a right to appointed counsel may entail.

¶71 Finally, a child's fundamental liberty interests are at stake not only in the initial deprivation hearing, but also throughout the series of hearings and review proceedings that occur as part of the dependency proceedings to address status and placement of the child following termination. The right to counsel in these proceedings, given the liberty interest at stake for the child, requires the appointment of counsel as well. A child continues to have rights in a reasonably safe living condition—free from emotional, physical, and psychological harm—which can only be protected through a competent advocate such as counsel.

¶72 In closing, I would suggest that the appointment of counsel for children is critically important to ensure the best outcome at the earliest stages of dependency proceedings. Better and earlier outcomes likely would realize many of the fiscal and administrative goals the GAL exception was designed to achieve. A child has firsthand knowledge of the abuse or neglect that has been perpetrated. His representations, if heard, may affect placement possibilities, lead to further investigation and accumulation of evidence, and potentially achieve permanency sooner. He may not want to divulge incriminating information about the people he loves to those charged with removing them from his life or to a GAL who will report his statements to the court. He may be

13

subjected to further abuse in the event his representations are revealed to persons not bound by requirements of confidentiality. He may have an objective to attain without divulging to a parent that he does not feel safe with them or that he wants to live apart from them. Maybe the child uniquely understands that a kinship placement poses the same threat to his well-being as remaining with the offending parent. These interests can only be protected by appointment of counsel who, in addition to being bound by provisions of confidentiality, has the tools to ensure erroneous decisions may be corrected. Further, and most importantly, having counsel listen and advocate his wishes provides the child with a voice—a say in his own destinyand, having been empowered to exercise his rights, may very well enable the child to avoid subsequent abuse.

¶73 I dissent from the Court's resolution of Issue 1. Ja.H. contends that if a district court errs in terminating parental rights when statutory requirements are left unsatisfied, this denies the child as well as the parent fundamentally fair process at each stage of the proceedings. Ja.H. maintains that "[w]hen, as here, the district court has applied the wrong statutory standards, an order terminating parental rights should be reversed and the case remanded for application of the proper criteria." While it is may be difficult for this Court to reverse the termination, especially given the amount of time taken to schedule the termination hearing, we cannot minimize or guess what Ja.H. may have said to the court by concluding that termination was ordered in any event. Any number of legal remedies were available other than termination which may have addressed Ja.H.'s concerns. As difficult as it may be, this Court is obliged to make hard decisions

14

particularly those rooted in fundamentally fair procedures of the trial courts. In this instance, I believe the need to ensure a fundamentally fair process in these proceedings, and those to come, requires that the matter, consistent with Ja.H.'s request, be remanded for a new termination proceeding in which Ja.H. is heard and represented by counsel.

¶74 I concur in all other respects with the Opinion of the Court.


/S/ LAURIE McKINNON

15