DA 21-0632

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2022 MT 182N

IN THE MATTER OF:

M.D.F. and C.R.F.,

      Youths in Need of Care.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause Nos. DN-16-072(B) and
DN-18-101(B)
Honorable Robert B. Allison, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Taryn Gray, Driscoll Hathaway Law Group, Missoula, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

      Travis R. Ahner, Flathead County Attorney, Katie Handley, Deputy County
Attorney, Kalispell, Montana

Submitted on Briefs:  August 10, 2022

Decided:  September 20, 2022

Filed:

                         Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion, and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 K.J.F. (Mother) appeals from the Findings of Fact, Conclusions of Law and Order by the Eleventh Judicial District Court, terminating Mother's and Father's parental rights to C.R.F. (age 4) and M.D.F. (age 2), and granting permanent legal custody to the Montana Department of Public Health and Human Services (the Department), with the right to consent to the children's adoption. We affirm.

¶3 In August 2016, the Department removed six-year-old C.A.F. and C.R.F., who was two years old at the time, due to concerns Mother and Father had exposed the children to physical abuse and neglect, psychological abuse, and a substantial risk of harm. The District Court adjudicated both children Youths in Need of Care (YINC), granted temporary legal custody (TLC) to the Department, and approved treatment plans for both parents in October 2016. Mother's treatment plan focused on addressing her mental health and concerns with her parenting skills. Specifically, the treatment plan included requirements to complete a mental health evaluation, engage in parenting classes, and participate in counseling services. Mother had to prove she could maintain safe and stable housing and safely parent before the children could return home.

¶4     After two failed trial home visits, in September 2017, the court extended TLC a second time and approved phase II treatment plans for Mother and Father, reiterating the agency's original concerns and reflecting new concerns regarding domestic violence in the home.  M.D.F. was born in October 2017 but was not removed at that time because both parents were actively participating in services.  The court extended TLC once more in April 2018.  C.R.F. returned home for a third trial visit in September 2018.  In October 2018, the Department dismissed C.R.F.'s case with the understanding that Mother and Father would continue participating in the treatment plans and services in place for C.A.F.'s case while he remained in therapeutic foster care.

¶5     In November 2018, Father assaulted Mother and Mother obtained a restraining order against him.  Later that month, Mother sustained severe head and back injuries in a car accident and became unable to continue services or care for C.R.F. and M.D.F.  The Department removed C.R.F. and M.D.F. without objection by either parent.  The District Court granted Emergency Protective Services (EPS) to the Department in December after Mother's counsel stipulated to the Petition for EPS on Mother's behalf because Mother was hospitalized and incapacitated.

¶6     At the January 9, 2019, show cause hearing, the District Court adjudicated C.R.F. and M.D.F. as YINCs and granted TLC to the Department, finding that "[r]etention of the children in the parents' care or return of the children to the parents' care is not possible and/or would place the children at unreasonable risk of harm affecting the children's health and well-being."  The Department proposed submitting Mother's and Father's existing

3

treatment plans, which were still in place in C.A.F.'s matter. Counsel for the Department stated, "I suspect that those plans don't need a considerable overhaul. We have discussed some services going forward. Perhaps there would be an additional parent/child evaluation as to [Father] regarding his ability to parent the children alone, but I don't really know that we need a third treatment plan." Without objection, the District Court approved the existing treatment plans as reasonable and appropriate under § 41-3-443, MCA.

¶7 In July 2019, Mother and Father stipulated to termination of their parental rights to C.A.F. The Department filed for extensions of TLC for C.R.F. and M.D.F. in August 2019, January 2020, July 2020, and January 2021. On December 17, 2019, the Department filed its Conditions for Return for C.R.F. and M.D.F., noting "ongoing concerns for both parents' ability to meet the safety and well-being needs of the children, establish positive attachment and demonstrate sustainability in the skills they have learned."

¶8 In March 2021, the Department informed the court that it intended to seek termination of both parents' parental rights and establish permanency with adoption. In July 2021, the Department petitioned to terminate both parental rights, claiming that Mother had made minimal progress on her mental health and parenting tasks since her accident and had failed to successfully complete court-ordered treatment plans after five years of intensive services.

¶9 The District Court heard testimony from several experts who testified to Mother's cognitive limitations and ongoing parenting challenges. Dr. Edward Trontel, who had conducted Mother's first psychological evaluation in October 2016 and third evaluation in

4

May 2019, testified that, in 2016, he determined Mother had borderline intellectual functioning and an unspecified anxiety disorder. Dr. Trontel opined at that time that for Mother to safely parent her children, she would need continued one-on-one intervention in her home over a long period of time. Dr. Trontel testified the results of his 2019 neuropsychological evaluation evidenced a substantial decrease in Mother's processing speed, which he predicted would affect her most severely when confronted with novel or complicated situations and make long-term in-home services even more important. When asked whether the effects of Mother's accident impacted the concerns he had with her ability to parent successfully in 2016, Dr. Trontel replied, "It would make those recommendations even stronger and would make the prognosis less positive."

¶10 Dr. Robert Page, who conducted Mother's second evaluation, in August 2017, testified Mother received a "substantially elevated" score in the Child Abuse Potential Inventory, a test designed to predict present and future physical child abuse. Dr. Page testified Mother's score in the Parent Awareness Skills Survey indicated she had adequate but minimal understanding of intervention methods, and parenting classes and continued education would be important.

¶11 Dr. Paul Silverman conducted a psychological and parental competence evaluation of Mother in March 2020, undertaking an extensive record review, collateral interviews, a lengthy interview with Mother, as well as psychological testing and observation of Mother with her children. Dr. Silverman agreed with prior evaluators that Mother had borderline intellectual functioning and anxiety. He testified Mother became agitated, scattered, and

began talking to herself while addressing hypothetical parenting scenarios. While Mother was able to describe some adaptive parenting behaviors, Dr. Silverman concluded that after several years of receiving services, additional coaching and education would likely be ineffective in increasing Mother's level of parenting competence.

¶12 Bernadette McDonald, director at Bear Logic Family Center, which provided supervised visitation and parent coaching to Mother and Father from March 2019 through the date of the hearing, testified neither parent had "advanced to be able to discern safety issues or be able to problem-solve in the moment." McDonald noted the parents often failed to pick up on basic cues from the children, lacked critical thinking skills, and repeatedly failed to implement techniques for handling the children's behaviors.

¶13 Child Protection Specialist Jodi Black-Fucci testified regarding the Department's efforts to reunify Mother with her children. Black-Fucci stated that, despite the parents' and the Department's best efforts, the treatment plans that were first ordered in 2016 and 2017 had been unsuccessful.

¶14 After two days of hearings, the District Court granted permanent legal custody of C.R.F. and M.D.F. to the Department, with the right to consent to adoption, finding by clear and convincing evidence Mother's treatment plans were unsuccessful, despite extensive interventions and, because continuation of the parent-child legal relationship would likely result in continued neglect, termination of Mother's and Father's parental rights was in the children's best interests. This appeal followed.[1]

---

[1] Father has appealed separately.

¶15 A natural parent's right to care and custody of a child is a fundamental liberty interest that must be protected by fundamentally fair procedures. *In re C.B.*, 2019 MT 294, ¶ 15, 398 Mont. 176, 454 P.3d 1195. Whether a parent was denied effective assistance of counsel in termination proceedings is a question of constitutional law over which this Court's review is plenary. *In re C.M.C.*, 2009 MT 153, ¶ 20, 350 Mont. 391, 208 P.3d 809.

¶16 Mother argues her due process rights were violated when her counsel failed to object to the court's "re-order" of the 2017 treatment plan. Mother contends the 2019 treatment plan was inappropriate and did not comply with Montana statute because it neither addressed the reasons for her children's removal in 2018 nor did it take into consideration the particular problems facing Mother at the time, namely, Mother's hospitalization and the effects of her diminished cognitive ability on her ability to parent. The State maintains Mother's 2017 treatment plan was still appropriate in 2019 because the Department and Mother's service providers continued to have the same concerns with her basic parenting skills, and the record reflects additional services were not likely to improve Mother's mental or physical limitations. The State argues since there was no basis for Mother's counsel to oppose the 2019 treatment plan as inappropriate, Mother has not made a threshold showing of ineffective assistance of counsel.

¶17 A treatment plan is one of the primary tools the Department uses to help a parent address the conditions that led to removal and facilitate reunification. *In re C.K.*, 2022 MT 27, ¶ 31, 407 Mont. 329, 503 P.3d 1104 ("The Department must in good faith develop and implement . . . treatment plans designed to preserve the parent-child relationship and the

7

family unit." (Internal citations and quotation marks omitted.)). Section 41-3-443(2), MCA, requires every treatment plan to identify the problems or conditions that resulted in the child's abuse or neglect, and treatment goals and objectives for each condition or requirement in the plan, including conditions or requirements for the safe return of the child to the family. *In re C.K.*, ¶ 31. "While a child may be initially removed for one specific reason, it is proper for the Department to determine other causes of abuse and neglect during the proceedings because the purpose of the proceedings is to protect the child." *In re J.G.*, 2004 MT 104, ¶ 20, 321 Mont. 54, 89 P.3d 11; *see also In re K.C.H.*, 2003 MT 125, ¶ 25, 316 Mont. 13, 68 P.3d 788 (finding a father's treatment plans were appropriate under § 41-3-443, MCA, despite not addressing the "problems or conditions that *resulted* in the abuse" because the plans identified the threshold problems or conditions creating the substantial risk of harm to the child's health and welfare, primarily, the lack of a stable home and safe environment). When a parent is disabled, "an appropriate treatment plan considers the parent's disability and is customized to meet those particular needs." *In re K.L.N.*, 2021 MT 56, ¶ 17, 403 Mont. 342, 482 P.3d 650.

¶18    Generally, "[a] parent who does not object to a treatment plan's goals or tasks waives the right to argue on appeal that the plan was not appropriate." *In re T.D.H.*, 2015 MT 244, ¶ 30 n.3, 380 Mont. 401, 356 P.3d 457 (citing *In re D.S.B.*, 2013 MT 112, ¶ 10, 370 Mont. 37, 300 P.3d 702). Mother asks this Court to review her treatment plan's appropriateness in light of her counsel's ineffective assistance throughout the procedures below. To establish a claim for ineffective assistance of counsel (IAC) in abuse and neglect

proceedings, a parent must demonstrate that counsel was ineffective, either due to subpar training and experience or the quality of counsel's advocacy during the proceedings, and the parent suffered prejudice as a result of counsel's ineffective representation. *In re B.J.J.*, 2019 MT 129, ¶ 15, 396 Mont. 108, 443 P.3d 488. Mother asserts her counsel had multiple opportunities to object to the treatment plan as inappropriate and her failure to do so was prejudicial because the court relied on Mother's failure to complete the plan as cause for terminating her parental rights.

¶19 On appeal, Mother does not challenge her counsel's training or experience, and we will not speculate as to counsel's lack of training or experience when no argument is advanced. *See In re C.M.C.*, ¶ 31. In the same vein, Mother does not identify which specific goals and objectives in her 2017 treatment plan she feels were inappropriate, or how the related tasks were not relevant to her situation in 2019. Instead, Mother claims her counsel should have either: (1) objected to the 2017 plan because it was inappropriate; (2) requested additional time to confer with Mother before allowing the court to apply the 2017 treatment plan to Mother's 2019 case; or (3) request the Department create a "simplified" treatment plan for Mother addressing only the issues directly related to Mother's hospitalization, the "condition[] that led to removal" in 2018.

¶20 Mother has not made a threshold showing of IAC because Mother has not established her counsel's assistance was ineffective. The record shows when C.R.F.'s case was dismissed in October 2018, it was with the expectation Mother would continue to strive to meet the requirements of her phase II treatment plan, which was still aspirational and

9

active in C.A.F.'s case; both C.R.F. and M.D.F. were developmentally delayed and C.R.F.'s development had regressed since returning to Mother's care; and despite finding Mother's physical and neurological functioning had decreased since her 2016 evaluation as a result of her accident, Dr. Trontel's assessment and recommendations from that original evaluation were "even stronger" and came with a "less positive" prognosis after his re-evaluation in 2019. In other words, the challenges Mother faced in 2017 to safely and successfully parent her children as reflected in her treatment plan were not only relevant but likely more formidable obstacles for her to overcome two years later.

¶21 Recognizing this, the Department continued to demonstrate good faith efforts to reunify Mother and her children throughout Mother's recovery, meeting with both parents and their attorneys multiple times since 2019 to discuss ways Mother and Father could continue to progress in their treatment plans, without either parent expressing any objection to the contents of the plans. Despite efforts spanning more than five years, the record supports the court's determination that Mother's "cognitive deficits, inability to keep her children safe in novel or unexpected situations and inability to provide an enriched environment for children with heightened needs . . . indicates an inability to exercise her fundamental parental rights in a responsible manner." Because we find the District Court did not err by re-ordering a 2017 treatment plan that was, for all practical purposes, still relevant and applicable to Mother's disabilities and particular needs in 2019, Mother has failed to establish her counsel was ineffective for failing to object.

¶22 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review. Mother has not demonstrated her counsel's advocacy was lacking or that she was prejudiced by her counsel's failure to object to the 2019 treatment plans as inappropriate. Affirmed.

/S/ INGRID GUSTAFSON

We concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ JIM RICE