Justice Ingrid Gustafson delivered the Opinion of the Court.
***145 ¶1 L.L.-C. (Mother) and O.D. (Father) independently appeal from an order of the Fourth Judicial District Court, Missoula County, terminating parental rights to their child, J.D. We affirm.
¶2 We restate the issues on appeal as follows:
1. Whether the District Court abused its discretion in terminating Mother's and Father's parental rights to J.D.
2. Whether the District Court abused its discretion in granting the CASA a subpoena to review notes from Father's therapist.
3. Whether the District Court abused its discretion in allowing the CASA to question witnesses at the termination of the parental rights hearing.
FACTUAL AND PROCEDURAL BACKGROUND
¶3 J.D. was born in 2007. Father was not present in J.D.'s life from age two until age eight. The Department became involved with Mother and seven-year old J.D. in October 2014, when Mother and J.D. went to Saint Patrick's Hospital Emergency Room in Missoula, Montana, for psychiatric care. Mother was first admitted to Providence Saint Patrick's Hospital, in Missoula, and then to the Dakota Place Crisis Facility, in Missoula, for more intensive care. J.D. was admitted to Shodair Children's Hospital in Helena, Montana. Mother acknowledged she was then unable to care for J.D. due to her and J.D.'s mental health needs. Neither Mother nor J.D. were current on their medications. Mother has a history of mental health issues, including diagnoses for anxiety, bipolar disorder, mild neurocognitive disorder, posttraumatic stress disorder (PTSD), and personality disorder. J.D. has bipolar disorder with psychotic symptoms, intermittent explosive disorder, reactive attachment disorder, PTSD, ***146 and misophonia.
¶4 In November 2014, the Montana Department of Health and Human Services (Department) petitioned for emergency protective services, adjudication of J.D. as a youth in need of care (YINC), and temporary legal custody (TLC) of J.D. J.D. was transferred from Shodair Children's Hospital to Whiteway Group Home in Butte, Montana, where J.D.'s condition improved due to the structure and consistency of the facility. The *134 District Court appointed counsel, Amy Lord, for J.D., and a Court Appointed Special Advocate (CASA). Darla Keck served as J.D.'s CASA starting on December 9, 2015. Both Lord and CASA Keck are licensed attorneys in the State of Montana.
¶5 Mother initially contested the Department's petition. At the show cause hearing, Mother stated she and J.D. had fled from Father when J.D. was two due to domestic violence. The District Court issued a Civil No Contact Order at Mother's request, prohibiting Father from contacting her except through his attorney. The court additionally ordered supervised contact between Father and J.D.
¶6 After a December 18, 2014 intervention conference, the parties vacated the show cause hearing, and the District Court adjudicated J.D. as a YINC and granted TLC to the Department for six months, to which Mother stipulated. On January 22, 2015, the District Court approved Mother's phase one treatment plan, to which Mother stipulated. The treatment plan required her to address her mental health needs and improve her mental stability and parenting skills, maintain safe and stable housing, and complete general tasks with the Department.
¶7 Following a March 17, 2015 hearing considering Father's ability to parent J.D., the District Court continued the Department's TLC. Father failed to respond to the petition or appear in court after service by publication. In April, the District Court ordered Father to complete a phase one treatment plan, requiring Father to: complete an anger management class; complete a danger risk assessment; have weekly or written communication with J.D.; complete a parenting class; maintain safe and stable housing; and maintain contact with the Department.
¶8 In late April 2015, the Department planned to transition J.D. to Watson Children's Shelter, a therapeutic foster home in Missoula, Montana, until Mother progressed further in her treatment plan. Mother opposed, arguing J.D. should be placed in her care. At a May 29, 2015 hearing, the District Court extended the Department's TLC until June 16, 2015, to monitor Mother's progress and visitations with J.D.
¶9 On June 8, 2015, the Department petitioned the District Court to ***147 extend TLC because it felt Mother needed additional monitoring and time to successfully complete her treatment plan. The Department expressed concern that Mother could not meet J.D.'s needs. Father attended a June 16, 2015 status hearing by phone and supported J.D.'s return to Mother's care. Father stated he was currently unemployed and lived with his mother in Libby, Montana, but wanted to reunite with J.D. The District Court extended the Department's TLC of J.D. for thirty days.
¶10 Following status hearings, the District Court extended TLC to the Department five additional times between July 18, 2015, and August 3, 2017, before the Department petitioned for termination of parental rights.
¶11 In July 2015, the Department transitioned J.D. to a trial home visit in Mother's care, with specialists from AWARE, Inc., a Montana mental health and residential service non-profit, providing in-home services for six hours per week, and support from additional wrap-around services. J.D.'s behavior at school deteriorated rapidly in Mother's care. He hit, kicked, threw things at adults, tried to choke another child, and was unstable and uncontrollable. Mother's mental health deteriorated as well. The trial home visit lasted five months before the Department removed J.D. from Mother and placed him back at Watson Children's Shelter. The Department determined Mother was unable to meet J.D.'s emotional needs and that J.D. felt unsafe in the care of his Mother.
¶12 At a December 2015 permanency plan hearing, the District Court approved a permanency plan first contemplating reunification with Mother, then, where reunification with Mother was untenable, contemplating reunification with Father. Father's counsel and CASA Keck informed the court that Father was writing to J.D., attending anger management, and working on his treatment plan. Father moved to Missoula and lived with his aunt to establish a relationship with J.D.
*135 ¶13 On April 22, 2016, J.D. was admitted to Saint Patrick's Hospital Emergency Room for expressing suicidal thoughts and making gestures to his counselor and school teachers indicating a desire to hang or stab himself. An affidavit submitted to the court by Child Protection Specialist (CPS) Angelo stated that J.D. was "worried about [Mother] and so he can't [talk about his feelings around her] and can't tell her that he is frustrated because it is bad for her and it makes him worried about what will happen to her if he 'acts the way he feels.' " J.D. told CPS Angelo that he felt "torn between his parents and [felt] like [Mother] doesn't like that he likes his [Father] and this makes him ***148 feel worse." CPS Angelo stated her belief that J.D.'s worsening dysregulation stemmed from the emotional conflict J.D. felt between his parents and his concerns for Mother's mental health. J.D. returned to Shodair Children's Hospital to stabilize and was eventually transferred to Rosemary Gallagher Children's Home, in Missoula, where he currently resides. According to reports, J.D. has worked hard to address his mental health needs and has progressed significantly in the highly structured environment at Rosemary Gallagher.
¶14 On June 28, 2016, the Court ordered Mother to complete a phase two treatment plan, to which she stipulated. On July 5, 2016, the District Court ordered Father to complete a phase two treatment plan, to which he stipulated.
¶15 Beginning in July 2016, Father attended nine individual therapy sessions with Debbie Viegut, a private clinical social worker in Missoula. Ms. Veigut identified two major problem areas for Father to work on: 1) mild to moderate depression; and 2) understanding the level of severity regarding his son's therapeutic needs. Father began working full-time, including extensive travel, and while he made time to visit J.D., Father struggled to find time to continue therapy. His last session with Ms. Veigut was on November 17, 2016.
¶16 Beginning in September 2016, Father began having weekly therapeutic visitation with J.D. Ryan Norton, J.D.'s therapist at Rosemary Gallagher, testified that J.D. and Father had a playful and loving relationship in their interactions with one another, but Father struggled to understand the seriousness of J.D.'s mental health needs. For example, Father thought chewing louder would desensitize J.D. of misophonia, a noise sensitivity disorder triggered by people chewing. Norton testified that Father seemed unwilling to alter his parenting style and follow therapeutic recommendations.
¶17 On April 11, 2017, the District Court granted CASA Keck's request and issued a subpoena for Father's medical and therapy records, specifically Father's entire file from Ms. Viegut. Father objected to the subpoena, arguing that Ms. Veigut had already submitted her mental health report to the Department and that the subpoena violated his privacy and that his private communications with his therapist were privileged as a matter of law. The District Court overruled Father's objection, noting that CASA Keck had special skills as an attorney. However, the court required CASA Keck to confidentially handle all materials received because of the subpoena. Ms. Veigut later testified that the subpoena violated her therapeutic relationship with Father.
¶18 On July 10, 2017, the Department petitioned for termination of ***149 both Mother's and Father's parental rights to J.D. The Department stated that Mother and Father had not completed their treatment plans and that their treatment plans were unsuccessful. The Department further argued that the conduct or conditions rendering Mother and Father unfit, unable, or unwilling to provide adequate parental care to J.D. were unlikely to change within a reasonable time. At the time of petition, J.D. had been in the Department's custody for twenty-six months.
¶19 Father subsequently contacted Ms. Veigut, asking to re-engage in therapy sessions. Ms. Veigut testified she needed more information from CPS Angelo before Father could re-engage in therapy sessions.
¶20 On August 15, 2017, the District Court denied Father's motions to remove CASA Keck for failure to submit a written report and to compel CASA Keck to produce the discoverable information she obtained in her role as J.D.'s CASA. The court concluded *136 that CASA Keck had been "actively and consistently involved with the case and ha[d] provided considerable oral information to guide the court." The District Court declined to remove her for not utilizing the standard written form. However, the District Court directed CASA Keck to make available to any party evidence she reasonably expected to use in making her recommendation to the court.
¶21 The District Court held a hearing on the termination of Mother's and Father's parental rights from August 30, 2017, to September 1, 2017, in which it heard testimony from Mother, Father, and nine witnesses involved in providing services to Mother, Father, and J.D. The District Court allowed CASA Keck to question witnesses, to which Father objected. CASA Keck cross-examined Father regarding past domestic violence alleged by Mother. CASA Keck did not submit evidence to the court to support her line of questioning. On March 2, 2018, the District Court ordered termination of Mother's and Father's parental rights. Mother and Father appealed. On November 20, 2018, Montana CASA GAL Association submitted an amicus brief urging this Court to affirm the District Court's decision, and, in doing so, to clarify the role of CASAs in dependency matters.
STANDARD OF REVIEW
¶22 This Court reviews a district court's decision to terminate parental rights for an abuse of discretion. In re A.S. , 2016 MT 156, ¶ 11, 384 Mont. 41, 373 P.3d 848 ; In re K.A. , 2016 MT 27, ¶ 19, 382 Mont. 165, 365 P.3d 478. This Court reviews a district court's findings of fact for clear error and conclusions of law for correctness. In re M.V.R. , 2016 MT 309, ¶ 23, 385 Mont. 448, 384 P.3d 1058. "A factual ***150 finding is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if review of the record convinces the Court a mistake was made." In re J.B. , 2016 MT 68, ¶ 10, 383 Mont. 48, 368 P.3d 715. "To reverse a district court's evidentiary ruling for an abuse of discretion, this Court must determine the district court either acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." In re I.M. , 2018 MT 61, ¶ 13, 391 Mont. 42, 414 P.3d 797.
DISCUSSION
¶23 1. Whether the District Court abused its discretion in terminating Mother's and Father's parental rights to J.D.
¶24 In termination proceedings, § 41-3-609(1)(f), MCA, protects a parent's fundamental right to the care and custody of a child. In re D.B. , 2007 MT 246, ¶ 17, 339 Mont. 240, 168 P.3d 691. A district court may only terminate the parent-child relationship of an adjudicated YINC if it finds "by clear and convincing evidence that: (1) an appropriate court-approved treatment plan was not complied with by the parents or was not successful; and that (2) the conduct or condition of the parents rendering them unfit was unlikely to change within a reasonable time." In re X.M. , 2018 MT 264, ¶ 18, 393 Mont. 210, 429 P.3d 920 (citing § 41-3-609(1)(f)(i), (ii), MCA ). A district court's foremost priority is the best interests of the child. In re T.S. , 2013 MT 274, ¶ 30, 372 Mont. 79, 310 P.3d 538.
¶25 Prior to the termination of parental rights, "the [D]epartment shall make reasonable efforts to prevent the necessity of removal of a child from the child's home and to reunify families that have been separated by the state." Section 41-3-423(1), MCA. To this end, the Department must develop and execute an appropriate "treatment plan to preserve the parent-child relationship and the family unit." In re D.B. , ¶ 33. While the Department must in good faith assist a parent in completing his or her treatment plan, the parent retains "the ultimate responsibility for complying with the plan." In re T.D.H. , 2015 MT 244, ¶ 42, 380 Mont. 401, 356 P.3d 457.
¶26 Section 41-3-609(1)(f), MCA, "requires complete compliance with a treatment plan, as opposed to partial or even substantial compliance." In re T.L. and K.L. , 2005 MT 256, ¶ 14, 329 Mont. 58, 122 P.3d 453. "[W]ell-intentioned efforts toward successful completion of a treatment plan do not demonstrate *137 either the completion or the success of the plan." ***151 In re Custody & Parental Rights of D.A. , 2008 MT 247, ¶ 22, 344 Mont. 513, 189 P.3d 631.
¶27 Section 41-3-609(2), MCA, states:
In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care.
¶28 "Conduct or condition of the parent" means the condition or reason causing the treatment plan to be unsuccessful. In re J.B. , ¶ 22. In making its determination, a district court gives "primary consideration to the physical, mental, and emotional conditions and needs of the child" and considers the "emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time." Section 41-3-609(2)(a), (3), MCA. "Children cannot always afford to wait for their parents to be able to parent." In re L.S. , 2003 MT 12, ¶ 15, 314 Mont. 42, 63 P.3d 497.
MOTHER
¶29 On appeal, Mother argues that the conduct or conditions rendering her unfit to parent J.D. are likely to change within a reasonable time. Mother recently changed her medication regime, felt more stable, and had completed most of the tasks required by her treatment plan.
¶30 The issue here is not merely whether Mother made some progress or whether she will continue to make progress in the future. The issue is whether she is likely to make enough progress, within a reasonable time, to overcome the circumstances rendering her unfit to provide J.D. with the structure and permanency he requires. See In re D.F. , 2007 MT 147, ¶ 43, 337 Mont. 461, 161 P.3d 825. What constitutes a reasonable time varies case by case and is largely dependent on J.D.'s extensive mental health needs. See In re D.F. , ¶ 43.
¶31 This Court, the District Court, and all parties involved, acknowledge Mother's love for J.D. and J.D.'s love for Mother. However, this Court and the District Court prioritize the best interests of the child in termination proceedings. The District Court ultimately found that Mother's treatment plan was unsuccessful, and that the conduct or conditions rendering Mother unfit to parent J.D. were ***152 unlikely to change within a reasonable time. The District Court considered witness testimony and an extensive record in its decision-making. Although Mother successfully completed many of the tasks asked of her and showed progress in her ability to parent J.D., the District Court concluded that Mother, due to her demanding mental health needs, difficulties managing medication and finances, and housing instability, did not show an ability to provide J.D. with the structure and permanency required to meet his demanding mental health needs.
¶32 A specific goal of family therapy for J.D. and Mother was for J.D. to see Mother as a competent and capable parent and for Mother to manage her emotions and stressors. This goal was not accomplished. Several specialists involved with Mother and J.D. noticed that "J.D. seemed to assume the caretaker role for his Mother while Mother seemed like she needed [J.D.'s] support and help." J.D.'s trial home visit with Mother was unsuccessful and resulted in a severe decline in J.D.'s mental health. Each time the Department removed J.D. from Mother's care, J.D. demonstrated less stress and dysregulation, discontinued the observable self-loathing behaviors, and showed more focus and ability to maintain himself at school; Mother's instability triggered J.D.'s dysregulation.
¶33 While Mother completed a parenting course, consistently visited and participated in family therapy with J.D., and attended individual therapy, Mother did not implement the therapeutic tools or recommendations from her therapists in her parenting. The District Court found that Mother "failed to demonstrate she [could] be a predictable caregiver and prioritize [J.D.'s] needs." The Department *138 repeatedly extended TLC to give Mother time to complete her treatment plan and reunify with J.D. Mother was ultimately unable to make the progress necessary over the twenty-six-month period to ensure J.D.'s safe-keeping in her care.
¶34 J.D. worries about his Mother's financial and mental instability and has suicidal thoughts and extensive mental health needs of his own. A sense of permanency and structure is critical to his well-being. The District Court determined it was against J.D.'s best interests to continue reunification efforts where he had already waited twenty-six months in flux and Mother's progress did not convince the court she would ever be able to meet J.D.'s needs. The District Court did not abuse its discretion in terminating Mother's parental rights to J.D.
FATHER
¶35 On appeal, Father argues that the Department failed to provide ***153 reasonable efforts to reunify him with J.D. pursuant to § 41-3-423(1), MCA, that he completed the majority of the tasks required by the treatment plan, and that the conduct or conditions rendering him unfit to parent J.D. were likely to change within a reasonable time. Specifically, Father contends the Department did not in good faith make reasonable efforts to reunite him with J.D., because the Department allowed Father to spend only limited time with J.D. Father was thus unable to improve his parenting skills and fully understand J.D.'s mental health needs. Father contends the Department then relied on Father's lack of parenting skills and understanding of J.D.'s needs to terminate his parental rights to his son.
¶36 Father was absent from J.D.'s life until 2015, when he informed the court he was unemployed, lived in Libby with his Mother, and was then unable to care for J.D. The District Court required Father to complete a treatment plan. The District Court found the Department's treatment plan to be "reasonable and adequate." The District Court concluded, and Father conceded at the termination hearing, that he did not complete his treatment plan. The District Court stated:
[Father] made some well-intentioned efforts in some areas of his [t]reatment [p]lan, like establishing contact with his child and participating in visits and family therapy, but Father has not complied with other areas of his [t]reatment plan such as following the recommendations of the professionals working with Father and [J.D.], mental health tasks, housing tasks, and other general tasks in his treatment plan.
This conclusion is supported by substantial evidence in the record.
¶37 While J.D. had at times expressed a desire to live with Father, the record supports that living with Father was not in J.D.'s best interests. Mr. Norton discontinued J.D. and Father's outings because J.D. expressed fear of his father and was destabilized after those visits. Mr. Norton, Ms. Veigut, and Mr. Halpern, J.D.'s fourth grade teacher, each expressed concerns that Father did not understand the severity of J.D.'s mental health needs, did not make any significant progress to understand J.D.'s needs, and did not implement specific parenting strategies to target those needs despite their support. The record shows that Father believed J.D.'s dysregulations and misophonia were attention-seeking, that J.D. was becoming institutionalized in the Department's care, and that appropriate discipline could resolve these issues. Mr. Norton testified he explained to Father that J.D.'s mental health issues needed to be taken seriously and that it was important for J.D. to feel believed and validated by Father. "However, Father was ***154 not receptive to altering his parenting style and expressed [J.D.] was fabricating his issues and that [J.D.]'s behaviors needed to be ignored." Despite a year of intensive therapeutic work, Mr. Norton did not observe any significant progress from Father and does not believe Father is able to change to meet J.D.'s needs.
¶38 This Court recognizes Father's love for J.D. and that Father maintained stable housing throughout this proceeding, moved to Missoula to be closer to J.D., and found full-time employment. However, Father conceded his housing was not currently suitable for J.D. Likewise, Father's demanding work *139 schedule meant he missed J.D.'s medical appointments, progress meetings with the Department, and individual therapy sessions, and did not maintain regular contact with the Department, as required by the treatment plan.
¶39 Father had over two years to complete his treatment plan. The District Court ultimately concluded "Father fail[ed] to recognize that intensive therapeutic support, ongoing attachment work, structure[,] and medication management [were J.D.]'s reality and necessary for [J.D.] to lead a successful life." The District Court did not abuse its discretion in terminating Father's parental rights to J.D. The record supports that Father did not complete his treatment plan, that the Department exerted reasonable efforts to reunify Father and J.D., and that Father's conduct rendering him unfit to parent J.D. was unlikely to change within a reasonable time.
¶40 2. Whether the District Court abused its discretion in granting the CASA a subpoena to review notes from Father's therapist.
¶41 CASA Keck requested the District Court to issue a subpoena requiring Ms. Veigut to produce Father's "entire file," including: "all notes, opening sheets, clinical data, testing, interview notes, clinical materials, appointment calendar reflecting his attendance at appointments, and any and all historical and biographical information." Father objected arguing that the subpoena request violated his constitutional right to privacy, that his private communications with Ms. Veigut were privileged, and that this breach of confidentiality ultimately did not serve J.D.'s best interests. See Mont. Const. art. II, § 10 ; § 26 -1-807, MCA; § 37-23-301, MCA. The District Court dismissed Father's objections, noting the confidential nature of dependency and neglect proceedings.
¶42 "In every case involving a victim of child abuse or neglect which results in a judicial proceeding," compliance with federal law requires:
a guardian ad litem [GAL], who has received training appropriate to the role, including training in early childhood, child, and ***155 adolescent development, and who may be an attorney or a [CASA] who has received training appropriate to that role (or both), shall be appointed to represent the child in such proceedings-
(I) to obtain first-hand, a clear understanding of the situation and needs of the child; and
(II) to make recommendations to the court concerning the best interests of the child.
42 U.S.C. § 5106a(b)(2)(B)(xiii) (2018)
¶43 In Montana, "the court shall appoint a [CASA] as the [GAL] for any child alleged to be abused or neglected" in every judicial proceeding. Section 41-3-112(1), MCA. "If a [CASA] is not available for appointment, the court may appoint an attorney or other qualified person to serve as the [GAL]." Section 41-3-112(1), MCA.[1] A court may also discretionarily assign a child an attorney in addition to a child's GAL. Section 41-3-425 (3), MCA. A Court must assign an attorney for a child in dependency and neglect proceedings where a child does not have an appointed GAL. Section 41-3-425(2)(b), MCA.
¶44 The general role of a CASA as a child's GAL in dependency and neglect proceedings is to act as an agent of the court, in the best interests of the child. CASAs are factual investigators that effectively serve as the eyes and ears of the court. Montana law states that a CASA acting as a child's GAL performs the following general duties:
(a) to conduct investigations to ascertain the facts constituting the alleged abuse or neglect;
(b) to interview or observe the child who is the subject of the proceeding;
(c) to have access to court, medical, psychological, law enforcement, social services, and school records pertaining to the child and the child's siblings and parents or custodians;
(d) to make written reports to the court concerning the child's welfare;
*140 (e) to appear and participate in all proceedings to the degree necessary to adequately represent the child and make recommendations to the court concerning the child's welfare;
(f) to perform other duties as directed by the court.
Section 41-3-112(3)(a)-(f), MCA.
¶45 In Montana, a CASA is not a party to these proceedings, regardless of his or her status as an attorney. Section 41-3-112, MCA.
***156 "[A]ny party may petition the court for the removal and replacement of the" CASA appointed as the child's GAL. Section 41-3-112(5), MCA. If a CASA were a party, another party could not petition the court for his or her removal. While Montana courts may discretionarily appoint counsel for a CASA "when appropriate and in accordance with judicial branch policy," CASAs do not have a right to legal representation. Section 41-3-425(1), (4), MCA.
¶46 A CASA does not have party status independent of a child, or as the child's representative, because a CASA does not represent a child in dependency and neglect proceedings. As an agent of the court, a CASA's role differs from that of a child's attorney. Whereas a child's attorney is duty-bound by the Montana Rules of Professional Conduct to maintain confidentiality and to advocate for a child's wishes, a child's CASA is generally an appropriately trained volunteer charged with the representation of the child's best interests regardless of his or her status as an attorney. In re A.D.B. , 2013 MT 167, ¶ 88, 370 Mont. 422, 305 P.3d 739 (McGrath, J., concurring); In re T.D.H. , 2015 MT 244, ¶ 69, 380 Mont. 401, 356 P.3d 457 (McKinnon, J., concurring and dissenting); Section 41-3-112(2), (3), MCA. Here, the District Court's order appointing CASA Keck specifically stated her role in the proceeding was to "represent the best interests of" J.D., and to "file periodic reports to the [c]ourt concerning the welfare and best interests of the child and the status of the case," not to represent J.D.'s wishes. The District Court appointed Amy Lord as counsel to represent J.D.'s wishes.
¶47 Where a CASA appointed as a child's GAL is an attorney, § 41-3-112(3)(g), MCA, permits a CASA "to file motions, including but not limited to filing to expedite proceedings or otherwise assert the child's rights." However, Montana law states:
The confidential relations and communications between a psychologist, psychiatrist, licensed professional counselor, or licensed clinical social worker and a client must be placed on the same basis as provided by law for those between an attorney and a client. Nothing in any act of the legislature may be construed to require the privileged communications to be disclosed.
Section 26-1-807, MCA.
¶48 While § 41-3-112(3)(c), MCA, authorizes CASA Keck to access Father's "court, medical, psychological, law enforcement, social services, and school records" in her role as J.D.'s GAL, Ms. Veigut provided the Department and CASA Keck with Father's mental health report. The health report adequately addressed the progress Father made on his treatment goals during their sessions. In Montana, Ms. ***157 Veigut's private therapy notes concerning Father are privileged communications akin to those between an attorney and a client, and cannot be compelled by a CASA appointed as a GAL in a dependency and neglect action. See § 26-1-807, MCA. Ms. Veigut testified the subpoena required her to break her promise of confidentiality to Father; she was unsure whether continued therapy would be successful given the breach of trust.
¶49 This Court agrees that:
In order to meet the goal of the reunification plan, the purpose underlying the statutory privilege-effective treatment-is material and significant. In other words, if a parent is fearful that any communications with her provider will not be privileged, she may not be open and truthful during treatment, thereby undermining the effectiveness of treatment and ultimately defeating the goal of remedying the reason for the removal of the child.
In re Wieland , 89 Ohio St.3d 535, 733 N.E.2d 1127, 1131 (2000). The Department's purpose in requiring Father to complete a treatment plan and attend therapy was for Father to openly and honestly address the personal *141 issues rendering him unfit to parent, so that he may improve and eventually reunite with his son. It is unproductive for the District Court to require disclosure of the very communication the Department encourages Father to have in therapy for use in termination proceedings. The purpose of therapy is thus undermined. Confidentiality better ensures productive, honest, and quality therapy, the goal of which is to help struggling parents reunite with their children. Maintaining the confidential therapist-patient privilege better serves the interests of a child in dependency and neglect proceedings. This Court holds that a GAL or CASA's access to psychological records pursuant to § 41-3-112(3)(c), MCA, does not include access to confidential therapy notes.
¶50 The District Court erred in issuing the subpoena, because the private communications between Father and his therapist are privileged in Montana, and disclosure beyond a therapist's mental health report discourages a parent in dependency and neglect proceedings from participating openly and honestly in therapy sessions, to the detriment of the child.
¶51 Despite the District Court's error in issuing the subpoena for Father's entire therapy record from Ms. Veigut, the court relied on evidence presented in open court, not on any confidential, privileged material or communications disclosed in Ms. Veigut's notes. The record strongly supports the District Court's determination to terminate ***158 Mother's and Father's parental rights to J.D. Therefore, the District Court's issuance of the subpoena was harmless error. See In re I.M. , ¶ 39.
¶52 3. Whether the District Court abused its discretion in allowing the CASA to question witnesses at the termination of the parental rights hearing.
¶53 On appeal, Father argues the District Court erred in permitting CASA Keck to cross-examine witnesses, because CASA Keck was not a party to the action, regardless of her expertise as an attorney.
¶54 CASA Keck, as J.D.'s GAL, is not a party and does not represent J.D. in an attorney capacity. Her role is "to appear and participate in all proceedings to the degree necessary to adequately represent the child and make recommendations to the court concerning the child's welfare." Section 41-3-112(3)(e), MCA. Consistent with this statute, a district court may permit an attorney CASA appointed as a child's GAL to conduct limited questioning of a witness to assist in performing his or her statutory functions as an agent of the court, in the best interests of the child.
¶55 Here, Amy Lord was counsel for J.D. Lord had the right to cross-examine witnesses, including Father, and had access to CASA Keck's and Ms. Veigut's reports. Additionally, Lord listed CASA Keck as a witness, so she could ask CASA Keck about the basis for her opinions in her report. J.D. was adequately represented. The District Court erred in allowing CASA Keck to cross-examine witnesses in this proceeding.
¶56 Although CASA Keck's actions were well-intended, her cross-examination of Father far exceeded the scope of her role as J.D.'s CASA and the degree necessary to adequately inform the court of what course of action would be in J.D.'s best interests. Despite the District Court's order that CASA Keck make available any evidence she expected to use in her role as an agent of the court to the parties, CASA Keck did not offer any evidence to support her report's conclusions or line of questioning at the termination hearing. For example, CASA Keck's following exchange with Father lacked foundation and was entirely inappropriate:
Q [THE CASA]: [W]asn't the other reason that there was a requirement for anger management be that you were, as you said in your words, 'beating the shit' out of [Mother] during the marriage?
A [Father]: I never said that.
Q: Well, you said that on an audiotape to law enforcement, did you not?
***159 A: No.
...
THE CASA: I have it on tape.
¶57 CASA Keck never made the tape available to the District Court or Father, yet during cross-examination relied on its existence to insinuate that Father physically *142 abused Mother, a fact not substantiated by the record. The District Court erred in allowing such an exchange, especially considering that J.D.'s counsel cross-examined Father, and had the opportunity to call CASA Keck as a witness.
¶58 However, the record supports the District Court's determination to terminate Mother's and Father's parental rights to J.D. without consideration of the information learned from CASA Keck's cross-examination of Father, and the District Court did not rely on that line of questioning in its findings. The District Court's error was harmless. See In re I.M. , ¶ 39.
CONCLUSION
¶59 The District Court did not abuse its discretion in terminating Mother's and Father's parental rights to J.D. While Mother and Father made well-intentioned efforts at completing their treatment plans, their treatment plans were ultimately unsuccessful. Despite the length of this proceeding, Mother and Father did not demonstrate sufficient progress for the District Court to conclude that the conduct or conditions rendering them unfit to parent J.D. were likely to change within a reasonable time. Substantial credible evidence supports the District Court's decision that it would be detrimental to J.D. to prolong his uncertainty about his long-term care provider.
¶60 The District Court abused its discretion by issuing a subpoena for privileged communication between Father and his therapist, and by letting CASA Keck cross-examine witnesses, including Father, where J.D. also had appointed counsel. However, because the record supports the District Court's decision to terminate parental rights without reference to the material that should have been excluded, the District Court's errors are harmless. The District Court's decision does not warrant reversal.
¶61 Affirmed.
We concur:
MIKE McGRATH, C.J.
JAMES JEREMIAH SHEA, J.
BETH BAKER, J.
JIM RICE, J.

Because the District Court here appointed a CASA to serve as J.D.'s GAL, this Court will use the term CASA to refer to CASA Keck's role as J.D.'s GAL.