FILED

09/22/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0659

DA 19-0659

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 242N

IN THE MATTER OF:

J.P.,

    A Youth in Need of Care.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADN 2017-49
Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

    Shannon Hathaway, Montana Legal Justice, PLLC, Missoula, Montana

    For Appellee:

    Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

    Leo J. Gallagher, Lewis and Clark County Attorney, Ann Penner, Deputy
County Attorney, Helena, Montana

Submitted on Briefs:  September 2, 2020

Decided:  September 22, 2020

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 J.S. (Mother) appeals the October 17, 2019 order of the First Judicial District Court, Lewis and Clark County, terminating her parental rights to her minor child, J.P. Mother argues that: (1) the District Court erred in terminating her parental rights upon finding she failed to complete her treatment plan and that she was unlikely to change in a reasonable amount of time; and (2) the District Court erred by allowing the court appointed special advocate (CASA) to participate in the termination hearing in her capacity as an attorney.[1] We affirm.

¶3 In January 2013, the Montana Department of Public Health and Human Services, Child and Family Services Division (Department), received reports that Mother was being criminally investigated for using and distributing methamphetamine from her residence while J.P., then an infant, was in her care. J.P. was removed from the home and placed in kinship foster care with his paternal grandparents, who were both 74 years old at the time,

---

[1] Mother also argues on appeal that her court-ordered treatment plan was inappropriate. Our review of the record reveals that Mother stipulated to the plan through counsel and did not propose an amended plan. Because "a parent who does not object to a treatment plan waives the right to argue on appeal that the plan was not appropriate," *In re A.L.P.*, 2020 MT 87, ¶ 17, 399 Mont. 504, 461 P.3d 136, we decline to address the merits of Mother's argument.

and his paternal aunt, Celia, who moved from Houston, Texas, to Helena to help her parents care for him. Once removed, J.P. tested positive for methamphetamine. On March 28, 2013, J.P. was adjudicated as a youth in need of care and placed in the Department's temporary legal custody, to which Mother stipulated. The District Court appointed J.P. a CASA guardian ad litem (GAL). On May 3, 2013, the District Court approved a treatment plan for Mother, which she later successfully completed. J.P. was returned to Mother's care and the case was dismissed on March 17, 2014.

¶4 The Department opened a new case against Mother in May 2017 after receiving a report from her Probation and Parole (P&P) officer that she admitted to using methamphetamine twice daily over the past 60 to 90 days and abusing prescription drugs while five-year-old J.P. was in her care. The Department again removed J.P. from Mother's care and petitioned for emergency protective services, adjudication as a youth in need of care, temporary investigative authority, and for temporary legal custody of J.P. Mother stipulated to J.P.'s adjudication and consented to the District Court granting the Department temporary legal custody of J.P. J.P. was appointed two CASA GALs, who were represented by counsel. Once removed, J.P. again tested positive for methamphetamine. He was placed in kinship foster care with his maternal aunt and uncle, Kim and Jason, and adult half-brother, Justin, who lived in a home adjoining Mother's.

¶5 On September 25, 2017, Mother was accepted to the First Judicial District Family Treatment Court. A treatment plan was ordered for Mother on December 21, 2017. On March 12, 2018, the Department's temporary legal custody of J.P. was extended for an additional six months, to which Mother stipulated.

¶6 On August 13, 2018, the Department filed a petition to terminate Mother's parental rights based on ongoing drug abuse concerns and J.P.'s recent disclosure of sexual abuse by his maternal relatives. As a result of the termination petition, Mother was discharged from Family Treatment Court.

¶7 The District Court conducted a termination hearing over the course of nine days, at which several witnesses testified. Child protection specialist (CPS) Averill testified that she met with Mother at P&P after receiving P&P's report that Mother had admitted to using methamphetamine. When CPS Averill requested Mother provide a urine sample, Mother declined and admitted to using "benzos" over the weekend but said she could not confirm or deny that she was on methamphetamine. CPS Averill also testified that Mother's behavior appeared to be "all over the place" and she made "concerning" statements that she "had the tools to be sober" but "preferred to be high" instead. Mother also explained that she was familiar with "the system," was "really good at BS-ing people," and that it would be her word against CPS Averill's word in court.

¶8 Gina Mello, J.P.'s preschool teacher from 2014 to 2017, also testified. She stated that while in Mother's care, J.P. would often arrive late at school with very bad breath, an unkempt physical appearance, and smelled of urine. She testified she would clean his face and brush his hair when he arrived at school. On one occasion, J.P. explained to her that he was late to school because he had to wake Mother. Ms. Mello testified that on two different occasions, J.P. arrived with cuts, bruises, and bumps on his head. When she initially asked J.P. about his injuries, he told her he fell out of a moving truck. The second time she inquired about his injuries, he told her he "couldn't say anything." Ms. Mello also

4

observed J.P. to be consistently tired and hungry at school. Ms. Mello stated she began giving him graham crackers or cheese sticks when he would tell her he was hungry, and eventually scheduled a snack time for the entire class so that J.P. could eat. Ms. Mello also testified she addressed J.P.'s tiredness and the importance of a schedule with Mother, who admitted he stayed up late watching television. Ms. Mello testified that on several occasions, J.P. would express that he did not want to go home with Mother or his maternal aunt and uncle.

¶9 J.P.'s paternal aunt Celia testified that she and her parents cared for J.P. when he was first removed from Mother's care in 2013. She continued to have regular contact with J.P. for approximately a year after he was returned to Mother's care, including paying for J.P.'s preschool and volunteering in his classroom, obtaining J.P. medical and dental care, and being designated the payee for the Social Security benefits J.P. began receiving upon his father's death from a heroin overdose in August 2012. Celia testified that J.P. began exhibiting sexualized behavior in the fall of 2017, after he was removed from Mother's care a second time and placed in Celia's care with regular visits with Mother. Around that time, Celia observed J.P. molding a breast and penis from modeling Styrofoam and stated J.P. became "very, very fascinated with bodily functions," such that he often attempted to see Celia naked, kiss her "how he and mom kiss," and "smell [her] vagina, because he gets to smell mom's." Celia testified that on another occasion, J.P. asked her to "suck his wiener" because "[w]ell, we all suck wieners—Justin, mom, grandpa, Kim, and Jason— we all suck wieners because it feels good." Celia also testified that after a visit with his maternal relatives Kim, Jason, and Justin, J.P. stated, "Well, we sucked wieners again."

5

When Celia asked J.P. whom he was referring to, he responded, "Well, this time it was just me and Justin and grandpa and Jason." Celia testified that J.P. became fearful of using the bathroom and began urinating himself at school, explaining to her that "bad things happen in bathrooms."

¶10    J.P.'s therapist, Cheryl Bouvier, also testified. Ms. Bouvier stated she had treated J.P. since 2014. Ms. Bouvier testified that during therapy sessions, Mother had difficulty "notic[ing] what was going on with [J.P.]" and instead focused on her own anxiety and feelings of missing him. Ms. Bouvier stated that J.P. had indicated to her that "maybe he'll see his mom when he's older—like after he's 18." Ms. Bouvier also testified that after his second removal, J.P. was anxious and found it difficult to talk about the sexual abuse but exhibited sexual behavior with the toys he was playing with during his therapy sessions. When asked by counsel what J.P. needed before contact could resume between him and Mother, Ms. Bouvier responded that J.P. "would need, from the child and the victim's perspective, some acknowledgement that somebody did something really bad to [him]."

¶11    Mother's own therapist, Jessica Gruber, testified that Mother exhibits some doubts that J.P. suffered sexual abuse, stating her view "vacillates and changes . . . she examines both sides still."

¶12    CPS Wadlington testified that after J.P. disclosed sexual abuse, Mother was unwilling "to accept what he was saying as true. The focus was on denying that anything had happened and on accusing other people of perhaps causing or coaching those statements from [J.P.]" CPS Wadlington stated that while Mother was able to partially comply with her treatment plan by following her visitation schedule with J.P., enrolling in

a parenting course, maintaining housing and employment, and attending therapy, Mother's lack of concern regarding J.P.'s sexual abuse allegations caused her concern regarding Mother's ability to complete her treatment plan task of "recogniz[ing] what is in her child's best interest versus her best interest," which "includes demonstrating stability in her life and an ability to recognize how her choices affect [J.P.]."

¶13    On October 17, 2019, the District Court ordered Mother's parental rights to J.P. be terminated.    The District Court determined that Mother's "steadfast refusal to acknowledge" that J.P. may have been sexually abused, combined with her twice subjecting her child to methamphetamine exposure, demonstrated Mother's "long-term substance abuse and character impairment in which change is not likely.    Accordingly, termination of [Mother's] parental rights is in the child's best interest."

¶14    We review a district court's decision to terminate parental rights for an abuse of discretion. *In re A.B.*, 2020 MT 64, ¶ 23, 399 Mont. 219, 460 P.3d 405; *In re B.F.*, 2020 MT 223, ¶ 29, 401 Mont. 185, ___ P.3d ___.    A court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment, or in excess of the bounds of reason resulting in substantial injustice. *In re A.B.*, ¶ 23.    We review a district court's findings of fact underlying its termination decision for clear error, and its conclusions of law de novo for correctness. *In re J.B.*, 2016 MT 68, ¶ 10, 383 Mont. 48, 368 P.3d 715. A factual finding is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if our review of the record convinces us that a mistake was made. *In re J.B.*, ¶ 10.    We do not substitute our judgment on appeal for that of the district court regarding matters of credibility or weight of evidence, nor do

7

we "review the record to determine whether the evidence would support a different finding." *In re M.J.*, 2013 MT 60, ¶ 17, 369 Mont. 247, 296 P.3d 1197 (quoting *In re K.H.*, 2012 MT 175, ¶ 19, 366 Mont. 18, 285 P.3d 474). Instead, we "view the evidence in the light most favorable to the prevailing party when determining whether substantial credible evidence supports the district court's findings." *In re J.B.*, ¶ 10.

¶15 Because the right to parent is a fundamental constitutional liberty interest, it must be protected by fundamentally fair procedures. *In re T.N.-S.*, 2015 MT 117, ¶ 20, 379 Mont. 60, 347 P.3d 1263. Whether a district court violated a parent's right to due process in a dependent neglect proceeding is a question of constitutional law for which our review is plenary. *In re T.S.B.*, 2008 MT 23, ¶ 20, 341 Mont. 204, 177 P.3d 429.

¶16 Mother first argues that the District Court erred in terminating her parental rights to J.P. upon finding Mother failed to complete her treatment plan and that she was unlikely to change in a reasonable amount of time.

¶17 Before a district court can terminate parental rights, "there must be an 'appropriate' treatment plan that the parent failed to comply with." *In re T.N.-S.*, ¶ 20 (quoting § 41-3-609(1)(f), MCA). A treatment plan "identif[ies] the problems or conditions that resulted in the abuse or neglect of the child and treatment goals and objectives that will address those conditions." *In re T.N.-S.*, ¶ 21 (citing § 41-3-443(2), MCA). A treatment plan also addresses the "particular problems facing both the parent and the child . . . ." *In re T.N.-S.*, ¶ 21.

¶18 "A parent does not successfully complete a treatment plan by partial, or even substantial, compliance." *In re A.K.*, 2015 MT 116, ¶ 28, 379 Mont. 41, 347 P.3d 711

(quotations omitted). "Even if a parent technically completes all of the tasks in a treatment plan," the parent is not deemed to have successfully completed the plan unless the parent "effectuates the purposes for which the plan was designed." *In re A.K.*, ¶ 28 (quotations and original alterations omitted).

¶19 When a parent fails to comply with or successfully complete an appropriate court-ordered treatment plan, and the parent's conduct or condition rendering her unfit is unlikely to change within a reasonable time, as shown by clear and convincing evidence, a district court may order termination of the parent's legal relationship with her child who has been adjudicated as a youth in need of care. *See* § 41-3-609(1)(f)(i)-(ii), MCA. Clear and convincing evidence in the context of parental rights cases is "simply a requirement that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be clearly established by a preponderance of the evidence or by a clear preponderance of proof." *In re A.K.*, ¶ 22. "It does not call for unanswerable or conclusive evidence." In re *A.K.*, ¶ 22 (quotations omitted).

¶20 "To determine that the condition or conduct that rendered a parent unfit is unlikely to change within a reasonable time, thus supporting termination, the court must find that the parent's conduct or condition renders the parent unfit, unable, or unwilling to give the child adequate parental care." *In re A.B.*, ¶ 27 (citing § 41-3-609(2), MCA). "[T]he question is not merely whether a parent has made progress or would make some progress in the future, but whether the parent is likely to make enough progress within a reasonable time to overcome the circumstances rendering her unfit to parent." *In re A.B.*, ¶ 27. A court

must also consider the parent's past and present conduct in making its determination. *In re J.C.*, 2003 MT 369, ¶ 11, 319 Mont. 112, 82 P.3d 900.

¶21 The District Court held a nine-day hearing and issued a thorough order detailing that Mother has received much supportive effort from the Department since 2013. Despite these efforts, J.P. has twice tested positive for methamphetamine, exhibited signs of poor health, hygiene, and hunger, and eventually made sexual abuse disclosures while in Mother's care that Mother was unable to fully acknowledge or take seriously. It is not enough that Mother "mechanistically check items off a task list" in progressing through her treatment plan. *In re A.K.*, ¶ 28. Mother has continuously demonstrated since 2013 that she is incapable of protecting J.P., understanding his needs, and putting his needs above her own. Instead, Mother's behavior demonstrates her intention to only minimally and temporarily engage the Department's services without fully rectifying the underlying issues that led to the Department's initial involvement. The District Court did not err in determining that Mother failed to complete her treatment plan and that she was unlikely to change in a reasonable amount of time, necessitating termination of her parental rights.

¶22 Next, Mother argues the District Court violated her due process rights when it allowed the CASA attorney to participate in the termination hearing by questioning witnesses. Mother asserts the CASA attorney's participation caused "double the amount of evidence presented against Mother, creating an additional unconstitutional burden for Mother to overcome."

¶23 In cases where a CASA is appointed as the GAL for an alleged abused or neglected child, the CASA's "general role . . . is to act as an agent of the court, in the best interests

10

of the child. CASAs are factual investigators that effectively serve as the eyes and ears of the court." *In re J.D.*, 2019 MT 63, ¶ 44, 395 Mont. 141, 437 P.3d 131. *See also In re B.F.*, ¶ 33 (A GAL's role in abuse and neglect proceedings "is to represent children's best interests, and to perform general duties and conduct investigations to ascertain the facts constituting the alleged abuse or neglect.").

¶24 Section 41-3-112(3), MCA, specifies the general duties a CASA GAL must perform, which include "appear[ing] and participat[ing] in all proceedings to the degree necessary to adequately represent the child and make recommendations to the court concerning the child's welfare." Section 41-3-112(3)(e), MCA. Consistent with this statutory duty, "a district court may permit an attorney CASA . . . to conduct limited questioning of a witness to assist in performing his or her statutory functions as an agent of the court, in the best interests of the child." *In re J.D.*, ¶ 52. In such situations, a district court retains its broad discretion in controlling the scope of cross-examination of witnesses. *See State v. Nelson*, 2002 MT 122, ¶ 15, 310 Mont. 71, 48 P.3d 739 ("[A] trial court has broad discretion to limit the scope of cross-examination to those issues it determines are relevant to the trial."). *See also In re B.F.*, ¶ 35 (determining district court in child abuse and neglect proceeding did not err by allowing children's GAL to conduct limited cross-examination of witnesses).

¶25 While a CASA is not a formal party to the dependent neglect proceeding, *In re J.D.*, ¶ 45, any party has the ability to "petition the court for the removal and replacement of the CASA appointed as the child's GAL." *In re J.D.*, ¶ 45 (quotations omitted).

¶26 Mother did not oppose the CASA attorney's appearance or her ability to file motions in the case. Mother also did not object to the CASA attorney calling and cross-examining witnesses or arguing on the CASAs' behalf during the proceedings. Furthermore, the District Court noted that CASA's counsel had been involved in the case since 2017 and was familiar with all the individuals involved, whereas counsel for the formal parties changed over the course of the case. The District Court did not err in allowing the CASA attorney to participate at a level it found appropriate given the specific circumstances of the case, and Mother's due process rights were not compromised.

¶27 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶28 We affirm.

/S/ MIKE McGRATH

We Concur:

/S/ DIRK M. SANDEFUR
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

12