DA 12-0282, DA 12-0284

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 290

IN THE MATTER OF

H.R. and D.R.,

Youths in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause Nos. DN 10-52, DN 10-53
Honorable Ingrid G. Gustafson, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Jennifer A. Giuttari; Montana Legal Justice, PLLC, Missoula, Montana
(for birth mother, T.R.)

For Appellee:

Steve Bullock, Montana Attorney General; Micheal S. Wellenstein,
Assistant Attorney General, Helena, Montana

Submitted on Briefs: October 24, 2012

Decided: December 18, 2012

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     The birth mother T.R. appeals from an order issued by the Thirteenth Judicial District Court, Yellowstone County, which terminated her parental rights to her two children, H.R. and D.R. (the children)[1]. T.R. argues that the State failed to prove that her treatment plan was appropriate, or alternatively that the State failed to prove that she had not complied with the treatment plan. We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2     T.R. has dealt with mental health issues all of her adult life. T.R. has been diagnosed with Schizoaffective Disorder, Bipolar Type, which is schizophrenia with a mood component. When not properly medicated, the schizophrenia causes her to have delusions and hallucinations, and the bipolar part of her disease can cause her to have manic behaviors. She has received treatment in a number of mental health facilities and currently takes three medications to control her symptoms.

¶3     Before this case began, T.R. had received treatment for her mental health issues in a Montana state mental hospital. When the Department of Health and Human Services (the Department) initiated this case in May of 2010, T.R. was living in Missouri. For nearly the entire duration of the Department's involvement in this case T.R. has been receiving mental health treatment at various Missouri medical facilities. Much of T.R.'s treatment has been at inpatient facilities. T.R. has received treatment at a rehab center, at a group residential facility, and in February of 2011 she was involuntarily committed to

_____

[1] The birth father has relinquished his parental rights to both children and has given formal consent to adoption.

what has been described as a lock-down facility in Salisbury, Missouri. She was subsequently moved to a similar facility in Milan, Missouri, where she was receiving inpatient treatment at the time of the termination hearing on February 9, 2012. It is uncertain when T.R. will be discharged from the facility in Milan, but her Missouri court-appointed guardian testified that it was unlikely that she would be discharged within one year of the termination hearing. Once she is discharged she will likely be placed in a residential care facility with twenty-four-hour staff and medication management. If T.R. is successful in the residential care facility, then she will move to a semi-independent apartment. T.R. may then qualify for a private apartment.

¶4 The State filed a petition to adjudicate H.R. and D.R. as Youths in Need of Care on May 5, 2010. H.R. was three years old and D.R. was four. The State's petition also sought Emergency Protective Services and Temporary Legal Custody of the children on behalf of the Department. Pursuant to stipulations, the District Court awarded the Department Temporary Legal Custody of the children on May 27, 2010, and adjudicated the children as Youths in Need of Care on August 10, 2010.

¶5 The District Court approved a treatment plan for T.R. on September 27, 2010, and the Department served it on her through counsel on September 29, 2010. Cindie Fitch, the Child Protection Specialist (CPS) who drafted T.R.'s treatment plan, testified that the plan had been designed to be fairly simple to make it workable for T.R. in light of her mental health issues. The treatment plan established four goals and listed nine tasks that T.R. had to complete to accomplish those goals. Among other things, T.R. was supposed to complete an anger assessment evaluation, maintain contact with the children through

3

cards or letters, and maintain weekly contact with CPS Fitch. T.R. did not object to any of the goals or tasks.

¶6 The State petitioned to terminate T.R.'s parental rights on September 23, 2011, and the District Court held a termination hearing on February 9, 2012. CPS Fitch testified that T.R. had failed to keep in contact with her, that she did not receive an anger assessment evaluation for T.R., and that T.R. had failed to maintain contact with the children. Fitch explained that she spoke with T.R. three times after being assigned to the case. On September 22, 2010, however, T.R. threatened to kill Fitch. After the threats, T.R. was instructed that she could no longer call Fitch and that she should keep in contact through letters. T.R. did not send any letters to Fitch.

¶7 Fitch also testified that although T.R. had sent some letters and birthday cards to the children, she had not done so since June of 2011. The Department did not give some of the cards to the children that T.R. had sent because they were deemed inappropriate. Testifying by phone from the facility in Milan, T.R. said that she had stopped sending letters and cards to the children because she was not sure what was appropriate.

¶8 The District Court issued findings of fact and conclusions of law on March 20, 2012. The court found that an appropriate treatment plan had been prepared for T.R. and approved by the court. The court further found that T.R. had not complied with that treatment plan. Specifically, the court found that T.R. had failed to comply with tasks two, six, and seven. Task two required T.R. to complete an anger assessment, sign a release of information, and request that a copy of the assessment be sent to CPS Fitch. Task six required T.R. to maintain contact with the children through cards and letters.

4

Task seven required T.R. to maintain weekly contact with CPS Fitch. The court also found that T.R.'s ongoing, pervasive mental health issues and need for continuing treatment made the condition rendering her unfit unlikely to change within a reasonable time. The court found that it was in the best interests of the children to have permanency and stability, and that the continuation of the parent-child relationship would likely result in continued abuse or neglect. The court thus concluded that it was in the children's best interests to terminate T.R.'s parental rights and issued an order to that effect.

## STANDARD OF REVIEW

¶9 We review a district court's termination of parental rights for an abuse of discretion. *In re J.J.L.*, 2010 MT 4, ¶ 14, 355 Mont. 23, 223 P.3d 921. Parental rights can be terminated if the child has been adjudicated as a youth in need of care, the parent has failed to comply with an appropriate treatment plan, and the conduct or condition rending the parent unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA. When considering whether the conduct or condition rending the parent unfit is likely to change, the district court must give primary consideration to the best interests of the child. Section 41-3-609(3), MCA. A child's need for a permanent, stable, and loving home supersedes a biological mother or father's right to parent the child. *In re D.A.*, 2008 MT 247, ¶ 21, 344 Mont. 513, 189 P.3d 631. We review findings of fact for clear error. *In re D.B.*, 2007 MT 246, ¶ 18, 339 Mont. 240, 168 P.3d 691. We review conclusions of law for correctness. *In re D.B.*, ¶ 18.

## DISCUSSION

¶10 T.R. argues that the State did not satisfy its burden of proof to establish that the treatment plan was appropriate for her. The State must prove by clear and convincing evidence at a termination hearing that a treatment plan was appropriate. *In re D.B.*, ¶ 33. Because each case is unique, we have refused to define a bright-line standard of what constitutes an appropriate treatment plan. *In re A.C.*, 2001 MT 126, ¶ 26, 305 Mont. 404, 27 P.3d 960. When evaluating the appropriateness of a treatment plan we consider whether the parent was represented by counsel, whether the parent stipulated to the treatment plan, and whether the treatment plan takes into consideration the particular problems facing both the parent and the child. *In re C.J.M.*, 2012 MT 137, ¶ 15, 365 Mont. 298, 280 P.3d 899. A parent who does not object to a treatment plan's goals or tasks waives the right to argue on appeal that the plan was not appropriate. *In re C.J.M.*, ¶ 16.

¶11 We will not consider arguments that are not properly preserved for appeal. T.R. did not object to any of the goals or tasks in her treatment plan when it was served on her. Significantly, T.R. did not contend at the termination hearing that the treatment plan was inappropriate. Because this issue was not argued to the District Court, we decline to fully consider it for the first time on appeal. Nevertheless, it is clear from our review of the record that the District Court correctly determined that T.R.'s treatment plan was appropriate. Although T.R. did not stipulate to the treatment plan, she was represented by counsel. More importantly, the State took T.R.'s mental health issues into consideration when it created the treatment plan. The person who drafted the treatment plan specifically testified that it was designed to be fairly simple so that it would be

workable for T.R. despite her mental disease. The goals of the treatment plan were to improve T.R.'s mental health status, to establish and maintain a safe, stable, and drug free home environment for the children, to maintain and improve T.R.'s bond with her children, and to cooperate with the Department so that the Department could evaluate compliance with the plan and identify other necessary parental skills that T.R. needed help developing. These goals and the tasks designed to accomplish these goals were appropriate for T.R.

¶12     T.R. argues next that the State did not establish by clear and convincing evidence that T.R. had failed to comply with the treatment plan. Whether T.R. complied with her treatment plan is a finding of fact that we review for clear error. *In re D.F.*, 2007 MT 147, ¶ 21, 337 Mont. 461, 161 P.3d 825. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if our review of the record convinces us that a mistake has been made. *In re C.J.M.*, ¶ 10. Complete compliance with a treatment plan is required. *In re L.H.*, 2007 MT 70, ¶ 19, 336 Mont. 405, 154 P.3d 622. Partial or even substantial compliance is insufficient. *In re L.H.*, ¶ 19.

¶13     T.R. argues that the court erroneously found that she had not complied with task two, the requirement that she complete an anger assessment and provide a copy to CPS Fitch, because it was entirely possible that T.R. had completed that task, but that the State was simply unaware that she had done so. T.R. bases her argument on testimony that releases had been signed on her behalf and evidence that Montana officials had difficulties getting information from Missouri agencies. When T.R. was directly asked at

7

the termination hearing if she had completed an anger assessment, however, she was nonresponsive to the question and simply stated that she usually is not very angry. CPS Fitch testified that she did not receive a copy of the anger assessment and was not aware that T.R. had actually completed one. CPS Fitch considered T.R. noncompliant with task two. The District Court's finding that T.R. had not complied with task two was supported by substantial evidence presented at the termination hearing.

¶14 T.R. also argues that the court erroneously found that she had not maintained contact with the children because she had attempted to comply with that requirement. T.R. contends that she failed to maintain contact only because her attempted contact was not approved by the Department. Although T.R. had sent cards and letters to the children on a couple of occasions, it is undisputed that she did not attempt to maintain contact after June 2011. T.R. admitted that she had stopped sending cards and letters to the children because she did not know what the Department considered appropriate. The evidence in the record unequivocally shows that T.R. failed to comply with task six.

¶15 Lastly, T.R. argues that she should not be considered noncompliant for failing to maintain weekly contact with CPS Fitch because the Department had directed her to stop calling Fitch on the telephone. T.R. asserts that she had attempted to maintain weekly contact until she was instructed to contact CPS Fitch solely through letters. It is undisputed, however, that T.R. was noncompliant for nearly an entire year. T.R. was prohibited from calling Fitch due to her own conduct; she threatened Fitch's life. After being instructed that she could not call Fitch, T.R. did not send a single letter to Fitch. T.R. was required to maintain weekly contact with CPS Fitch, and it is undisputed that

8

she did not do so. Partial compliance with a treatment plan is insufficient, and so was T.R.'s attempt to comply with task seven.

## CONCLUSION

¶16    The District Court concluded that it had been established by clear and convincing evidence that the best interests of the children would be served by termination of the parent-child legal relationship. We find no reason in fact or in law to disturb the District Court's order.

¶17    Affirmed.


/S/ MIKE McGRATH


We concur:

/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS
/S/ JIM RICE