FILED

07/29/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0640

DA 24-0640

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 164N

IN THE MATTER OF:

K.B.,

      A Youth in Need of Care.

APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of Dawson, Cause No. DN-21-005
Honorable Olivia Rieger, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Kelli S. Sather, Kelli S. Sather, PLLC, Missoula, Montana

    For Appellee:

        Austin Knudsen, Montana Attorney General, Thad Tudor, Assistant
Attorney General, Helena, Montana

        Brett Irigoin, Dawson County Attorney, Cody Lensing, Deputy
County Attorney, Glendive, Montana

Submitted on Briefs:  June 4, 2025

Decided:  July 29, 2025

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Father appeals the September 27, 2024 Order terminating his parental rights issued by the Seventh Judicial District Court, Dawson County. We affirm.

¶3 The issues restated on appeal are: (1) whether the District Court erred in granting temporary legal custody (TLC) to the Department of Public Health and Human Services (the Department) instead of to Father, the non-custodial parent; (2) whether the District Court erred by ordering a treatment plan for Father and in doing so violated Father's due process rights; and (3) whether Father received ineffective assistance of counsel (IAC).

¶4 K.B. was removed from her mother's care on February 10, 2021 based on allegations of Mother and her significant other neglecting K.B., failing to maintain a clean home environment, neglecting K.B.'s medical care, excessive use of discipline, and Mother's failure to address her own and K.B.'s mental health needs. K.B.'s biological father resided in North Dakota and was a non-custodial parent. Prior to these proceedings, Father knew of K.B., but he was not a part of her life. After the Department's investigation, the District Court adjudicated K.B. as a youth in need of care on June 1, 2021, and placed her in her stepfather's care. The court ordered a treatment plan for Mother, but it did not order a treatment plan for Father because he was the non-offending parent at the time.

2

Furthermore, Father expressed that he did not want to establish visitations with the child until he could confirm his paternity.

¶5 The court extended TLC over K.B. while Mother completed her treatment plan. Once Father established he was K.B.'s biological father, he began visitations with the child to set up a parenting relationship. Not long after, the Department said it was going to propose a treatment plan for Father because he was becoming inconsistent with contact with the Department and child visitations. The District Court ordered a treatment plan for Father on February 2, 2022. During this time, Mother and Father reconciled, and Mother moved in with Father in North Dakota.

¶6 After another TLC extension, the Department placed K.B. and her brother in Mother and Father's home in North Dakota. At a review hearing on August 16, 2022, the court was concerned placement with Mother was not in the children's best interests due to safety concerns of the children, police going to the home, Father's criminal activity, and the children's escalating behavior. Mother voluntarily returned K.B.'s brother to Montana in September 2022, because she could not manage his behaviors.

¶7 After the brother was returned to Montana, K.B. struggled in school with anger outbursts, and Mother's parenting relapsed into what it was like prior to Department involvement—excessive discipline, threats of physical abuse, lack of supervision, and K.B. threatening self-harm. As a result, the court extended TLC a fourth time on November 15, 2022, however K.B. remained with the parents in their home. The Department tried to work with the North Dakota Child Protection Services to conduct a safety evaluation of the parents' home, but the North Dakota agency was largely unresponsive.

3

¶8 The Department removed K.B. from the parents' home on April 21, 2023, and placed her in foster care with her stepfather. The basis for the removal was Father's failure to complete a mental health evaluation, failure to complete the court-ordered parenting and psychological evaluation that was scheduled, failure to complete a parenting program, inappropriate communication with the Department, failure to work on tasks in the treatment plan, reports to North Dakota Child and Family Services related to allegations of abuse and/or neglect of K.B., Mother's mental health issues, Mother's failure to take her medication, Mother's failure to verify her attendance at parenting classes, and Mother's failure to provide verification of income.

¶9 Ultimately, the State petitioned for termination of parental rights, and the District Court held a hearing on the termination of Father's parental rights on September 4, 2024. The District Court terminated Father's parental rights for failure to complete his treatment plan. The District Court found:

> [Father] has failed to complete tasks related to consistently engaging in visitation with the child, inability to recognize the responsibility [Father] has and the parenting deficiencies that must be corrected, failure to engage in individual mental health therapy, failure to address anger issues, failure to address the changes in the home that must be made in order to provide safe and consistent parenting to the child, failure to understand [K.B.'s] mental health and the diagnoses she has been given, failure to follow-through with getting [K.B.] to her necessary mental health therapy, failure to engage [K.B.] in services and follow through with those services, failure to present himself for the parenting assessment on two different occasions with Dr. Roche, failure to engage or understand the needs of [K.B.] as she has been placed outside the home; and failure to keep in communication with the Department.

The District Court also found that Father's ability to provide adequate parental care was unlikely to change within a reasonable time "based upon the testimony provided in this

4

matter, the length of time that [Father] has been working with providers and the Department, and his inability to demonstrate any change of circumstances."

¶10 We review a district court's termination of parental rights for an abuse of discretion. *In re E.Y.R.*, 2019 MT 189, ¶ 21, 396 Mont. 515, 446 P.3d 1117. We review a district court's findings of fact for clear error and conclusions of law for correctness. *In re E.Y.R.*, ¶ 21. "A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if review of the record convinces this Court a mistake was made." *In re E.Y.R.*, ¶ 21.

¶11 In termination proceedings, parents have a right to effective assistance of counsel. *In re E.Y.R.*, ¶ 22. We review counsel's training, experience, and advocacy to determine whether assistance was effective. *In re E.Y.R.*, ¶ 22. IAC requires reversal only if the parent suffered prejudice. *In re E.Y.R.*, ¶ 22.

¶12 On appeal, we first consider whether the District Court erred in granting TLC to the Department instead of placing K.B. with Father, the non-custodial parent. If a child has been adjudicated a youth in need of care, a district court may grant TLC if dismissing the petition would create a substantial risk of harm to the child and reasonable services were first provided to the parent to try to prevent the removal of the child. Section 41-3-442(1), MCA. Granting TLC to the Department allows it to place the child in care provided by a custodial or non-custodial parent, kinship foster home, youth foster home, youth group home, youth shelter care facility, or institution. Section 41-3-442(3), MCA. Further, the Department has an internal policy that requires it to prioritize a non-custodial parent for

placement. *In re E.Y.R.*, ¶ 28. Absent good cause for the child not to be placed with the non-custodial parent, the child should not be placed with anyone else. *In re E.Y.R.*, ¶ 28.

¶13 Father argues that according to the Department's policy, a non-custodial parent is the first placement option that should be considered, unless there is documented evidence that the non-custodial parent is not a safe placement. Because there was no evidence showing he was an unsafe placement option, Father asserts K.B. should have been placed with him. The Department argues that Father stipulated to TLC with the Department, so he cannot raise the issue of whether the court failed by not placing K.B. in his care on appeal. Additionally, the Department points out that despite the priority consideration given to the non-custodial parent, § 41-3-442, MCA, allows the Department some placement discretion.

¶14 Here, the initial hearing for temporary investigative authority took place on March 9, 2021. At the time, Father was unsure of his biological relationship to K.B. Until he could confirm his paternity, Father did not wish to have contact with the child—let alone have the child placed in his care. Father did not object to TLC or K.B.'s placement with her stepfather, and he did not indicate a desire for K.B. to be placed with him as a non-offending parent. As such, the court placed K.B. in her stepfather's care with her siblings. The court advised Father he could pursue visitation and parenting options if he chose, however Father responded that he wanted to wait until he confirmed he was the father.

¶15 At a hearing for TLC on June 1, 2021, Father told the court that he had established that he was K.B.'s biological father. At this hearing, Father again did not object to TLC in

6

favor of the Department, nor did he ask for K.B. to be placed in his care. Rather, Father stipulated to the proposed TLC. The District Court proceeded as previously planned with placing K.B. in her stepfather's care.

¶16 On appeal, Father relies on precedent explaining how the Department must first consider the non-custodial parent as a placement option. For example, in *In re J.B.*, 278 Mont. 160, 923 P.2d 1096 (1996), J.B. was removed from his mother's care and adjudicated a youth in need of care. His father, who resided out of state, stipulated to the Department's request for TLC, and indicated a desire to obtain custody of J.B. This Court ultimately found the district court erred in concluding that J.B. was a youth in need of care without considering the lack of a basis of abuse or neglect on J.B.'s father's part, and therefore the court erred in granting the Department TLC. *In re J.B.*, 278 Mont. at 162-64, 923 P.2d at 1098-99. Placement with the non-offending, non-custodial parent relieved the State from any further obligation to the children, as the concern for them being youths in need of care was eliminated by the placement. *See In re S.S.*, 2012 MT 78, ¶¶ 16-17, 364 Mont. 437, 276 P.3d 883.

¶17 The difference between the cases Father relies on and the instant case is that at the hearing where the District Court considered placement options, Father was unsure of his paternity, he did not wish to have contact with K.B. until he could confirm his paternity, he did not have any sort of relationship with K.B., and he did not indicate a desire to have K.B. placed with him.

¶18 We cannot fault the Department or District Court for not initially placing K.B. in Father's care. Indeed, the Department must first consider placement with a non-custodial

7

parent when removing a child from a custodial parent. However, in this case, Father—the non-custodial parent—was unsure of his paternity and wished to confirm he was indeed K.B.'s father before he became involved in the proceedings and the child's life. Father did not object to granting TLC to the Department nor to placing K.B. in her stepfather's care. As such, we find the District Court did not err in granting TLC to the Department or in placing K.B. in her stepfather's care.

¶19 Next, we consider whether the District Court erred in ordering a treatment plan for Father as a non-custodial or non-offending parent and whether the plan violated his due process rights. Father argues on appeal the District Court erred by ordering him to complete a treatment plan when he was the non-offending parent. Father also asserts his due process rights were violated because he was not given notice of the treatment plan nor an opportunity to object to it. Finally, Father asserts the treatment plan itself was not appropriate for him.

¶20 A district court may order a treatment plan if the child was adjudicated as a youth in need of care. Section 41-3-443(1), MCA. A treatment plan must be ordered within 30 days of the disposition hearing except for good cause shown. Section 41-3-443(7), MCA. "Because each case is unique, we have refused to define a bright-line standard of what constitutes an appropriate treatment plan." *In re H.R.*, 2012 MT 290, ¶ 10, 367 Mont. 338, 291 P.3d 583. To determine whether a treatment plan is appropriate, "we consider whether the parent was represented by counsel, whether the parent stipulated to the treatment plan, and whether the treatment plan takes into consideration the particular problems facing both the parent and the child." *In re H.R.*, ¶ 10.

8

¶21 "A parent who does not object to a treatment plan's goals or tasks waives the right to argue on appeal that the plan was not appropriate." *In re T.S.*, 2013 MT 274, ¶ 25, 372 Mont. 79, 310 P.3d 538 (citation omitted). "Where a parent fails to object to a treatment plan in a timely manner, the parent waives any argument regarding the propriety of the treatment plan." *In re T.S.*, ¶ 25.

¶22 Here, Mother was ordered to complete her own treatment plan at the outset of the proceedings in 2021. Father was not required to complete a treatment plan at that time because he was considered the non-offending parent, and he was not involved in K.B.'s life. After K.B. was removed from Mother's care and Father established his paternity, Father wished to slowly become part of K.B.'s life through visitations. At first, Father attended all scheduled visitations and kept in contact with the Department. Then, Mother reconciled with Father and moved into his home. Once Mother, with prior and ongoing Department history and established parenting deficits, moved in with Father, there was sufficient basis for the Department to be involved in assessing K.B.'s living situation and monitoring its appropriateness—including Father's abilities to provide for K.B.'s care and development. After Mother moved in, Father missed visitations and did not keep up with his communication with the Department. It was at this point on February 2, 2022, that the District Court approved a treatment plan for Father. The plan required Father to undergo a parenting assessment, mental health evaluation, chemical dependency evaluation, engage in consistent visitation with K.B., maintain consistent contact with the Department, provide a safe housing environment for the child, and provide verification of a legal means to support the family.

9

¶23 Father was not represented by counsel when the court approved his treatment plan in February 2022. Father had been denied a public defender due to his income, and he had not hired private counsel. The record reflects that Father chose to represent himself throughout the entire proceedings up to that point and would continue to do so, unless he found the need for an attorney arose. Additionally, the District Court provided that Father may qualify for a hardship exception to the income limit for a public defender, but Father did not complete the paperwork to pursue that option. Father was eventually appointed counsel in December 2023 after the District Court approved the Department's permanency plan.

¶24 Throughout the proceedings, Father stipulated to and did not object to the treatment plan nor the court's approval of the plan without a hearing. Rather, Father attempted to complete the plan's requirements. Furthermore, at the September 4, 2024 termination hearing, Father testified that a child and protective services (CPS) worker explained the treatment plan to him piece by piece. Father also testified he had a chance to review the treatment plan with his attorney and that he understood the plan and its requirements. Father also requested more time to complete the plan. Thus, because Father failed to object to the treatment plan in a timely manner, he has waived any challenge to the propriety of the plan. *In re T.S.*, ¶ 25.

¶25 As for Father's due process claim, we find it unpersuasive. Although it is standard practice, a hearing on a treatment plan is not required by statute. *See* § 41-3-443, MCA. Although a parent may object to a treatment plan, the parent's consent is not needed for the District Court to approve a treatment plan. Rather, pursuant to § 41-3-443, MCA, the

10

court may order a treatment plan if: (1) the parent admits the allegations of abuse, (2) the parent stipulates to the allegations of abuse, or (3) the court has adjudicated the child a youth in need of care. Here, K.B. was adjudicated a youth in need of care. At first, Father did not have a treatment plan, but he started to miss child visitations and became inconsistent in communicating with the Department. When Mother—the very person whom K.B. was removed from to begin with—moved into Father's residence, the court ordered a treatment plan to understand the reasons for Father's behaviors and ensure K.B.'s future safety. Accordingly, the District Court did not err by ordering a treatment plan for Father as he reviewed the plan with counsel and CPS, he attempted to complete the plan, and he did not object to the plan or the lack of treatment plan hearing.

¶26     Finally, we consider Father's claim of IAC. Father claims his counsel failed to advocate for placement of K.B. with him as a first option and failed to object to his treatment plan. According to Father, his ineffective counsel caused him prejudice by losing his parental rights over K.B.

¶27     Father asserts his case is similar to *In re E.Y.R.* where this Court concluded counsel provided ineffective assistance. In *In re E.Y.R.*, the father's counsel "did not assiduously advocate for placement with Father despite the provisions of § 40-6-221, MCA, and the Department's policy that the non-custodial parent is the first placement option for the child." *In re E.Y.R.*, ¶ 36 (internal quotations omitted). Here, Father did not have counsel—by his own choosing—until well after K.B. was placed with her stepfather and the proceedings had begun. By the time Father did gain counsel in December 2023, he was no longer considered a non-offending parent—Mother and Father had a failed trial home

placement from May 2022 through April 2023, Father was arrested for criminal mischief and failed to report it to the Department, K.B. reported Father was mean to her and she was afraid Father would physically harm her, he was reportedly intoxicated every night, and K.B.'s behavior at school became disruptive and aggressive—to the point that her school counselor reported psychosis-like behavior of reporting and seeing things that were not real, and that she showed up to school with improper hygiene. Thus, it would have been fruitless for Father's counsel to object to the court's placement of K.B. both retroactively when the court first placed her with her stepfather and presently when she was removed from Father's care for his failure to safely parent her and meet her needs.

¶28 On the record before us we find no error in the District Court's initial granting of TLC to the Department nor IAC on the part of Father's counsel.

¶29 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶30 Affirmed.

/S/ INGRID GUSTAFSON

We Concur:

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA

12